WESTCHESTER CORPORATION and Glenn McMillan Developing Company, Plaintiffs-Appellants,

v.

PEAT, MARWICK, MITCHELL & COMPANY et al., Defendants-Appellees.

No. 79–1340.

United States Court of Appeals, Fifth Circuit.

Oct. 1, 1980.

Rehearing Denied Nov. 24, 1980.

John A. Townsend, Robert I. White, Houston, Tex., for plaintiffs-appellants.

James C. Slaughter, Houston, Tex., for defendants-appellees.

Before WISDOM, RONEY and HATCHETT, Circuit Judges.

RONEY, Circuit Judge:

Brought as a securities fraud action asserting both federal and state claims, this case involves a real estate sales contract. The seller of the land asserts the defendant auditors misrepresented the purchaser's financial condition. Holding that the contract was not a "security" under either the federal or state statutes, and that pendent state common law negligence and fraud claims were barred by the statute of limitations, we affirm the summary judgment for defendants.

Because the question whether a real estate contract is a security turns on the facts, we set them forth in some detail in a light most favorable to plaintiffs, the parties opposing the motion for summary judgment. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

*Facts*

In the middle 1960s plaintiff Westchester Corp., a Texas firm, conceived a plan to develop a large residential tract in Harris County, Texas. Under the plan, plaintiff Glenn McMillan Developing Co. (McMillan), a Westchester subsidiary, would prepare blocks of property for the commencement of actual construction of residential units. In 1973, after development of some of the sections had been completed, McMillan entered into a sales contract with a subsidiary of National Equities, Inc., an unrelated construction company to whom lots had previously been conveyed. Under the agreement, McMillan would develop the remain-

der of the tract and transfer it in phases on a scheduled basis to the purchaser, which agreed to pay fixed sums in cash as the properties were transferred. After each phase of property was improved and conveyed, McMillan was to have no further interest in or responsibilities toward the property.

The one exception to cash payments related to phase III of the project, a flood plain where residential construction was deemed impractical. Transfer of this portion of the project was to be for a lesser sum per acre than for the developed acreage, and was to be paid on a deferred basis.

Plaintiff sellers required some assurance from National Equities that it had the financial capabilities to carry out the plan as contemplated, due to the substantial undertakings required of Westchester and McMillan. Westchester relied upon representations in the form of financial statements prepared by National Equities' auditor, defendant Peat, Marwick, Mitchell & Co. Those financial statements indicated National Equities had a net worth in excess of $27-million, an amount substantially in excess of National Equities' commitments under the contract.

Prior to June 1974, the first development phase was completed, for which McMillan received $1,274,000. On June 24, 1974, however, McMillan sued National Equities and its subsidiary in Texas state court, alleging breach of contract for refusing to close on another phase of the development. The suit sought termination and cancellation of the contract and liquidated damages. Counsel for plaintiffs explained at oral argument that termination and cancellation of the contract were sought instead of specific performance because of the prospect that National Equities would be financially unable to perform. In December of 1974, McMillan recovered judgment for $898,600 against National Equities and its subsidiary for the liquidated damages. The judgment was affirmed by the Court of Civil Appeals in *NEI Corp. v. Glenn McMillan Developing Co.*, 550 S.W.2d 113 (Tex.Civ.App.—Houston 1977), and was later settled for $550,-000.

On April 16, 1975, the Wall Street Journal reported National Equities "announced the resignation of it president and plans for an $11 million write-off." According to the Journal, the write-off was to be "reflected in the company's financial statement for the year ended March 21." The Journal reported in its April 28 editions that Peat, Marwick had withdrawn its certification from the National Equities financial report for fiscal 1974, and added that National Equities revealed "it was experiencing 'operating difficulties' and that its creditors were requiring immediate or accelerated repayment." These two articles were followed by a June 7 report in The Houston Post that National Equities was then experiencing operating difficulties, which a National Equities official blamed on " 'less than efficient management practices.' " The official also stated, " 'Texas lenders aren't willing to work with our company because of an auditing problem, which we are trying to get worked out.' "

During the pendency of the state court suit for liquidated damages, Westchester officials became aware of National Equities' deteriorating financial condition, and in January 1976 acquired 100 shares of National Equities stock in order to receive regular reports of National Equities' finances. Some time after April 29, 1976, Westchester received a copy of National Equities' annual report, which had been filed with the Securities and Exchange Commission for the fiscal year ending March 31, 1975. National Equities restated its financial statement in the report for the fiscal year ending March 31, 1974, and further revealed that Peat, Marwick had been dismissed as its auditor because of certain audit deficiencies. In explaining the financial statement adjustment, the company said the 1974 adjustments may have related back to earlier years. National Equities had also been named, along with Peat, Marwick, as a defendant in two actions commenced in federal courts in Ohio and New York, alleging various violations of the federal securities acts and the issuance of false

and misleading financial statements. On December 2, 1975, National Equities and others brought suit in New York state court against Peat, Marwick alleging breach of contract and negligence in connection with its audit of National Equities' financial statements for the fiscal year ending March 31, 1974.

The suit at bar, not commenced until November 29, 1977, was brought against Peat, Marwick, a partnership with offices in Texas, and several of its partners. The district court, without findings or opinion, "concluded that all of the assertions of defendants' motion for summary judgment are meritorious," and entered judgment for defendants.

We have thoroughly reviewed the record and determined there are grounds upon which the district court's judgment may be sustained on each of plaintiffs' claims. *See Jaffke v. Dunham*, 352 U.S. 280, 281, 77 S.Ct. 307, 308, 1 L.Ed.2d 314 (1957); *Gay Student Services v. Texas A & M University*, 612 F.2d 160, 163 (5th Cir. 1980).

### Federal Securities Claim

Plaintiffs alleged defendant, in the preparation of National Equities' financial statements, violated section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j(b), and rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 (1979). The key to recovery under these sections is the purchase or sale of a "security." *National Bank of Commerce v. All American Assurance Co.*, 583 F.2d 1295, 1298 (5th Cir. 1978).

Plaintiffs assert the real estate contract is a "security." A real estate contract is not listed as a security in section 3(a)(10) of the Securities Exchange Act, 15 U.S.C.A. § 78c(a)(10), which defines a security for purposes of the Act. Investment contracts are listed as securities, however, and flexible principles applied to the definition require the real estate contract to be treated as a security if it has the essential elements of an investment contract, the economic reality being the basis for determination. *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564

(1967). The Supreme Court has established three elements that bring an instrument under the definition of investment contract: (1) investment, (2) common enterprise, and (3) expectation of profit derived solely from the efforts of others. *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1102–03, 90 L.Ed. 1244 (1946). This definition under the Securities Act of 1933 can be treated as the same in the context of this case. *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 847 n. 12, 95 S.Ct. 2051, 2058 n. 12, 44 L.Ed.2d 621 (1975).

This Circuit has required all three *Howey* elements to be present for a land contract to constitute a security. *Cameron v. Outdoor Resorts of America, Inc.*, 608 F.2d 187, 192–93 (5th Cir. 1979), *modified on rehearing on other grounds*, 611 F.2d 105 (1980). Contrary to plaintiffs' argument, the *Howey* test has not been met on the facts of this case.

First, there is no "common enterprise," since the fortunes of the investors are not " 'interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties.' " *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 478 (5th Cir. 1974) (quoting *SEC v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476, 482 n. 7 (9th Cir.), *cert. denied*, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973)). The contract in this case simply provided that the purchaser was to pay fixed sums at fixed intervals for phases of developed property as available for conveyance from the sellers. Under the contract, if a phase was not completed, the purchaser had no obligation. After conveyance of the tracts, the sellers' interest and responsibilities were to cease. This is not the kind of symbiotic relationship where "the fortunes of all investors are inextricably tied to the efficacy" of common management and promotion. *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d at 479; *see Cameron v. Outdoor Resorts of America, Inc.*, 608 F.2d at 193. The only exception in this case may have related to the third development phase, which was not to be improved, and was to be paid for at an

ascertainable time on a partly deferred basis. The purchase price, however, did not depend upon either the profits or productivity of the property or purchaser.

Second, although the sellers may have been led to expect profits from this transaction, that expectation did not derive "solely from the efforts of the promoter or a third party." *SEC v. W.J. Howey Co.*, 328 U.S. at 299, 66 S.Ct. at 1103; *United Housing Foundation, Inc. v. Forman*, 421 U.S. at 854, 95 S.Ct. at 2061; *Commander's Palace Park Associates v. Girard & Pastel Corp.*, 572 F.2d 1084, 1085–86 (5th Cir. 1978); *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d at 477. Here the purchasers did not lead McMillan to expect that management arranged by National Equities would provide the sole or crucial efforts needed to produce profits. *Commander's Palace Park Associates v. Girard & Pastel Corp.*, 572 F.2d at 1085–86. "The key issue is whether the managerial efforts are functionally essential or undeniably significant to that profit, . . ." *Cameron v. Outdoor Resorts of America, Inc.*, 608 F.2d at 193. Managerial efforts of the kind contemplated by these authorities is lacking here. McMillan, under the contract, was charged with the initial task of readying the tracts for their eventual development. Until the time of conveyance, National Equities had no interest in or responsibilities toward the land. Only when National Equities took title to the land did its own managerial efforts come into play. Accordingly, whatever profits plaintiffs were to derive here had nothing whatever to do with National Equities' managerial efforts as to the conveyed land.

Plaintiffs, however, assert that our decision in *Rekant v. Desser*, 425 F.2d 872 (5th Cir. 1970), is controlling, reasoning that in return for their own investment in the land and development costs, plaintiffs received substantial commitments from National Equities and its subsidiary to make payments on the land. In *Rekant v. Desser* a corporation's president fraudulently caused the firm to issue a deferred payment note payable to him for the purchase of land. Plaintiffs liken the commitment in the real estate contract here to the commitment in that note. In *Rekant* the Court held the

transaction fit into the "any note" definition in section 3(a)(10), characterizing the transaction as the issuance by a corporation of its own securities. Even if the contract were to be treated the same in reality as a note, however, *Rekant v. Desser* would not be controlling because of the nature of the transaction. Subsequent cases in this Circuit have held that a promissory note, although defined generally as a security under the federal statute, fits the definition only when an investment in nature, and generally does not fit the definition when merely reflective of an individual commercial transaction. *Reid v. Hughes*, 578 F.2d 634, 638 (5th Cir. 1978).

In another note case, *National Bank of Commerce v. All American Assurance Co.*, 583 F.2d 1295, 1301 (5th Cir. 1978), the reasoning is instructive:

> No special investment rights were given to the payee. The note was payable in fixed amounts at fixed times, repayment not being conditioned upon profit or productivity of the company. No class of investors was involved, only the lending bank. The bank anticipated no gain beyond repayment of the note with interest. The note was not a "security" within the meaning of the federal securities acts.

*See McClure v. First National Bank*, 497 F.2d 490, 493–95 (5th Cir. 1974); Annot., 39 A.L.R.Fed. 357 (1978).

Here, the alleged security was merely a contract for the purchase of land in phases. No special investment rights were given to sellers. The purchase price was fixed. Repayments were not conditioned upon profits or productivity of the land. No class of investors was involved. The plaintiffs anticipated no gain beyond payment of the sums stipulated under the contract. Since the contract was not a "security" within the meaning of the federal securities laws, no cause of action has been stated on this ground.

### State Securities Claim

Plaintiffs alleged a violation of the Texas antifraud provision, Tex.Rev.Civ.Stat.Ann. art. 581–33 (Vernon 1964 & Supp. 1979). On appeal, plaintiffs concede that the state

law follows the federal law as to the definition of a "security." In order to make out a claim under that section, plaintiffs had to demonstrate the existence of a "security," as defined under state law. Tex.Rev.Civ. Stat.Ann. art. 581–4(A) (Vernon 1964). Because the Texas courts have engrafted the federal decisional law onto the state definition, the district court was correct in granting defendants' motion for summary judgment on this point. *See generally Searsy v. Commercial Trading Corp.*, 560 S.W.2d 637, 639–41 (Tex.1977); *King Commodity Co. v. State*, 508 S.W.2d 439 (Tex.Civ.App.—Dallas 1974).

### Common Law Negligence

■ Plaintiffs alleged Peat, Marwick was liable for Texas common law negligence in the preparation of National Equities' financial statements. The district court granted defendants' motion for summary judgment, dismissing all additional claims *with prejudice*. The district court has discretion to dismiss pendent claims without prejudice where the federal claims are dismissed. *UMW v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Pharo v. Smith*, 621 F.2d 656, 674–75 (5th Cir. 1980). Since the district court did not assign any reasons, however, and the plaintiffs failed to seek clarification of this order, the dismissal operates as an adjudication on the merits. Fed.R.Civ.P. 41(b).

■ On appeal it appears that Peat, Marwick was entitled to judgment as a matter of law because plaintiffs' negligence claim was barred by the statute of limitations. Suits alleging common law negligence in connection with rendition of professional services must be brought within two years of the time the tort was committed. Tex. Rev.Civ.Stat.Ann. art. 5526 (Vernon 1958 & Supp. 1979); *Atkins v. Crosland*, 417 S.W.2d 150, 153 (Tex.1967); *see Citizens State Bank v. Shapiro*, 575 S.W.2d 375, 386 (Tex. Civ.App.—Tyler 1978, *writ ref'd n. r. e.*); *Fishel's Fine Furniture v. Rice Food Market*, 474 S.W.2d 539, 540 (Tex.Civ.App.— Houston 1971).

■ Regardless of the exact point when the tort was committed for limitation pur-

poses, it was clearly more than two years before the institution of this suit. Plaintiffs entered into the real estate contract in reliance upon the representations made in the financial statements prepared by Peat, Marwick on March 30, 1973. This date is more than four years before suit was filed. Even if the tort was not committed for limitation purposes until the damage occurred or was known, since plaintiffs sought damages by suit in June 1974, when McMillan sued National Equities for breach of contract in Texas state court, that would seem to be the last point at which the time for limitation would commence. That date was more than three years before the present action was filed.

Accordingly, the undisputed facts compel the conclusion that plaintiffs' negligence claim was barred by the statute of limitations.

### Common Law Fraud

■ Plaintiffs' common law fraud claim is also controlled by the two-year statute. Tex.Rev.Civ.Stat.Ann. art. 5526 (Vernon 1958 & Supp. 1979). As to a fraud claim, however, the statute of limitations does not begin to run until the fraud is discovered, or when by the exercise of reasonable diligence it might have been discovered. The Texas courts have held that knowledge of facts which would lead to discovery of the fraud if diligently pursued by a reasonably prudent person is equivalent to knowledge of the fraud as a matter of law. *Pace v. McEwen*, 574 S.W.2d 792, 797 (Tex.Civ.App. —El Paso 1978, *writ ref'd n. r. e.*); *see White v. Bond*, 362 S.W.2d 295, 295 (Tex. 1962); *Dunn v. Travelers Insurance Co.*, 362 S.W.2d 412, 414 (Tex.Civ.App.—San Antonio 1962, *writ ref'd n. r. e.*); *Cartwright v. Minton*, 318 S.W.2d 449, 454 (Tex.Civ.App. —Eastland 1958, *writ ref'd n. r. e.*). In this case, there were sufficient undisputed facts to satisfy this test.

■ At the time of their 1974 suit for liquidated damages, plaintiffs were aware of certain problems in National Equities' financial situation, and for that reason elected not to seek specific performance of the contract. This was approximately one

year after National Equities had represented its net worth substantially exceeded its commitments under this contract. This should have put plaintiffs on notice of possible problems with the financial statements prepared by Peat, Marwick, National Equities' auditor, and the statement upon which they had relied in 1973. Other information available to plaintiffs more than two years prior to the institution of this suit should likewise have put plaintiffs on notice.

The two April 1975 Wall Street Journal articles revealing that National Equities had announced plans for substantial write-offs, and that Peat, Marwick had withdrawn its certification for National Equities' financial statements also may have led to discovery of the fraud. The June 1975 Houston Post article that indicated National Equities was experiencing auditing difficulties was likewise sufficient to spark an inquiry into Peat, Marwick's role in National Equities' financial woes.

Thus, more than two years before November 1977, plaintiffs could have learned that

—Peat, Mawrick had withdrawn financial statement certification as a result of errors relating to the year ending March 31, 1974 statement;

—Peat, Marwick had asked to be relieved of its auditing duties unless it could be released from liability in connection with work done for certain National Equities subsidiaries;

—Peat, Marwick was dismissed as National Equities' auditors as of July 1, 1975; and

—two lawsuits were filed in September 1975 against National Equities and Peat, Marwick alleging the fraudulent preparation of financial statements.

All these facts, taken together, were sufficient to give plaintiffs actual knowledge of possible fraud on Peat, Marwick's part, or to suggest that plaintiffs initiate some investigation of Peat, Marwick's efforts on National Equities' behalf. Accordingly, plaintiffs' fraud claim is barred by the two-year statute of limitations, and summary judgment was correctly entered on this score.

Defendants also assert the summary judgment was supported for the following reasons: (1) the action of McMillan in cancelling and rescinding the real estate contract in the suit against National Equities and its subsidiary precluded recovery from defendants for damages plaintiffs allege they suffered as a result of the nonperformance of the contract, and (2) since the contract contained a liquidated damage provision and since one of the plaintiffs sued for and recovered liquidated damages, plaintiffs were not entitled to recover further damages from anyone else. Because of our decision as to the validity of the statute of limitations ground for summary judgment, however, we need not consider these additional grounds.

Likewise, we need not consider plaintiffs' argument that they should have been allowed to amend their pleadings by dropping certain parties to support diversity jurisdiction, because of our decision that the district court properly disposed of the claims under its pendent jurisdiction.

AFFIRMED.