EASTERN AIRLINES, INC., Plaintiff,

v.

MOBIL OIL CORPORATION, Defendant.

No. 74–765–Civ–SMA.

United States District Court,
S. D. Florida,
Miami Division.

May 1, 1981.

James H. Bratton, Jr., Donald Rickertsen, John G. Despriet, Gambrell, Russell & Forbes, Atlanta, Ga., William G. Bell, Jr., Vice-President, Legal, Laurence A. Schroeder and James Knight, Walton, Lantaff, Schroeder, Carson & Wahl, Miami, Fla., for plaintiff.

David S. Batcheller, Smathers & Thompson, Miami, Fla., Francis A. Rowen, Jr., New York City, Andrew J. Kilcarr, Donovan, Leisure, Newton & Irvine, Washington, D. C., Thomas R. Trowbridge, III, Donovan, Leisure, Newton & Irvine, New York City, for defendant.

## MEMORANDUM OPINION AND ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

ARONOVITZ, District Judge.

Eastern Airlines, Inc. (hereinafter "Eastern") commenced this action on June 12, 1974, by filing a six-count complaint naming Mobil Oil Corporation (hereinafter "Mobil") as Defendant. By Order dated February 3, 1975, counts 3, 4 and 5 were dismissed. *See* Docket No. 19. The remaining counts seek to recover damages for allegedly excessive prices charged on certain petroleum products sold by Mobil to Eastern during the one-year period November 1, 1973, to October 31, 1974.[1]

Claiming that Mobil overcharged for jet fuel in violation of the Economic Stabilization Act of 1970, *see* 12 U.S.C. § 1904 note, the Emergency Petroleum Allocation Act of 1973, *see* 15 U.S.C. § 751 *et seq.*, and petroleum price control regulations promulgated thereunder, Eastern, in count 1, seeks damages "in excess of $2.4 million." ¶ 19 of Complaint. In count 2, Eastern seeks to treble the damages recovered under count 1

---

1. By Order dated December 31, 1979, the Court granted Eastern leave to add a seventh count to the complaint, setting forth a claim for relief under the Robinson-Patman Act. That count has, however, been severed from remaining counts 1, 2 and 6, and all proceedings with respect to count 7 have been stayed. *See* ¶ 4 of Docket No. 240.

on the basis that the overcharges alleged were due to intentional and willful conduct. *See* 15 U.S.C. § 754, which adopts § 210 of the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note. Finally, in count 6 Eastern alleges that Mobil and others, in violation of § 1 of the Sherman Act, *see* 15 U.S.C. § 1, conspired to restrict the supply of and trade and competition for petroleum products, including jet fuel, in order to gain monopoly profits and thereby caused Eastern to suffer damages of "many millions of dollars." ¶ 34 of Complaint. The suit is now before the Court on the parties' Cross-Motions for Partial Summary Judgment with respect to counts 1 and 2 of the Complaint. The issues raised by the cross-motions have been comprehensively briefed and the Court has heard oral argument from the parties' respective counsel.

### · BACKGROUND

The salient facts and circumstances which precipitated this lawsuit are not in material dispute. Under a written agreement dated November 1, 1966, Mobil was Eastern's jet fuel supplier at Boston and Syracuse from February 1, 1970 to February 1, 1973, and at Los Angeles from September 23, 1969 to February 1, 1973. Upon expiration of those contracts, Eastern entered into supply arrangements with other petroleum companies but, on November 1, 1973, pursuant to the federal government's petroleum allocation program necessitated by the Middle East oil embargo,[2] Mobil was required to supply Eastern's jet fuel requirements at Boston, Los Angeles and Syracuse. Neither party in these proceedings challenges the

administrative order requiring Mobil to resume supplying jet fuel to Eastern at the designated airports. It bears mention, however, that this mandatory supply relationship was imposed by the government upon both Mobil and Eastern, despite the fact that the prior contracts between the two had expired· and notwithstanding the fact that Eastern had entered into supply contracts with other companies at Boston, Syracuse and Los Angeles. The mandatory supply relationship continued until October 31, 1974 (exactly one year), at which time Eastern entered into supply arrangements with other oil companies and ceased being supplied by Mobil.

Because there was no contractually established price for the jet fuel provided by Mobil during the mandatory supply period, prices to Eastern were controlled by federal mandatory petroleum price regulations. Those regulations were promulgated under the authority of the Economic Stabilization Act of 1970 and the Emergency Petroleum Allocation Act of 1973 in response to national shortages and disruptions in the petroleum industry. Although the regulations at issue in this lawsuit were amended during the Eastern-Mobil mandatory supply period,[3] the underlying regulatory scheme remained unchanged.

In general, while the regulations did not establish the actual prices Mobil charged, they did set a ceiling on the prices a refiner, such as Mobil, *could* charge. These maximum prices (variously called "base" prices and "maximum allowable" prices) were equal to the sum of the weighted average price at which the refiner sold the "product

---

**2.** Those programs included the Mandatory Allocation Program for Middle Distillate Fuels, 38 Fed.Reg. 28660 (1973), and the Mandatory Petroleum Products Allocation Program, 39 Fed. Reg. 1924 (1974), as amended and as administered by the Federal Energy Administration and its predecessor agencies.

**3.** In November, 1973, when the mandatory supply relationship began, the mandatory allocation and pricing program was administered by the Cost of Living Counsel ("CLC"). CLC regulations applicable to refiners were promulgated on January 14, 1974. *See* 38 Fed.Reg. 30267 *et seq.* (1973). After the Federal Energy Ad-

ministration ("FEA") was established, refiner pricing regulations, which substantially readopted the CLC regulations, were promulgated on January 14, 1974. *See* 39 Fed.Reg. 1952 *et seq.* (1974). These FEA regulations were in effect for the remainder of the time period at issue in this litigation and therefore all references to regulations shall be to that version unless otherwise indicated. Regulations of this sort were recently made unnecessary by President Reagan's Executive Order 12287, eliminating price and allocation controls on crude oil and refined petroleum products. *See* 46 Fed. Reg. _____ (1981).

involved" (in this case, jet fuel) to similarly situated customers (called "classes of purchaser")[3a] on or about May 15, 1973, plus an increment based upon increased product costs incurred by the refiner since May 15, 1973. 10 C.F.R. § 212.82(b). The regulations required a refiner to identify classes of purchasers which existed on May 15, 1973, and to calculate weighted average May 15, 1973 prices for each class of purchaser it identified, based upon actual prices at which the refiner sold the product involved to members of the class of purchaser on or about May 15, 1973. These May 15, 1973 weighted average prices served as a floor above which price increases could be made.

Subject to certain restrictions, permissible *price* increases were limited to product *cost* increases incurred by the refiner since May 15, 1973. 10 C.F.R. § 212.82(b). The aggregate of such increased costs for "covered products" (which include jet fuel) could be allocated among the various products in that category at the refiner's discretion, provided that the amount of such increase was "equally applied to each class of purchaser." 10 C.F.R. § 212.83(c)(ii). Refiners were not, however, required to pass through increased costs in the month actually incurred. Instead, where a refiner passed through less than all increased costs, because of contractual commitments or other commercial considerations, the regulations permitted a refiner to save or "bank" these "unrecovered cost[s]" for recoupment at a later date. In other words, whenever increased product costs were not recouped in a given month, they were added to a cumulative fund or "bank" of unused increased costs which could then be used to calculate the maximum lawful price in subsequent months, provided they were applied equally to each class of purchaser in computing maximum lawful prices in that month. 10 C.F.R. § 212.83(d). Thus, "maximum allowable" or "base" prices were to be ascertained for each class-of-purchaser by adding together (1) the May 15, 1973 weighted average price for the product involved, (2) the increased product costs incurred during the immediately preceding month, and (3) product cost increases incurred since May 15, 1973, which were not previously passed through (i. e., banked costs).[3b] *See Longview Refining Co. v. Shore*, 554 F.2d 1006, 1017 (Em.App.1977).

Eastern and Mobil agree that, for purposes of determining the "maximum allowable" or "base" price for the jet fuel sold to Eastern during the mandatory supply period, the applicable class of purchaser consisted of commercial airlines at each of the three airports involved here, with the commercial airlines at each airport constituting a separate class.[4] Thus, the May 15, 1973 weighted average price, for use in establishing prices to Eastern, was computed by reference to transactions with other commercial airlines at the appropriate airport. Eastern and Mobil disagree, however, concerning the manner in which the May 15, 1973 weighted average prices should have been computed. Moreover, since Eastern, unlike other commercial airlines supplied by Mobil, was without a contractual price commitment from Mobil, the regulations discussed above permitted Mobil to charge the May 15, 1973 weighted average price plus increased product costs. As a result, during the mandatory supply period Eastern was paying higher prices than previously charged by Mobil. In addition, these prices

---

**3a.** "Class of purchaser" was defined as "purchasers or lessees to whom a person has charged a comparable price for comparable property or service pursuant to customary price differentials between those purchasers or lessees and other purchasers or lessees." 10 C.F.R. § 212.31.

**3b.** While not relevant to the issues raised here, we note that the regulations also permitted refiners to recover, upon satisfaction of certain pre-conditions, so-called "non-product" costs on a dollar-for-dollar basis. *See* 10 C.F.R. § 212.82(b), (c).

**4.** *See* Docket No. 318 at ¶ 2. In view of this stipulation, inquiry will not be made here into Eastern's class of purchaser determination. *Compare Pacific Service Stations Co., et al. v. Mobil Oil Corp.*, 636 F.2d 306 (1980) (reversing summary judgment finding no unlawful overcharge because the district court failed to determine the applicable class of purchaser).

paid by Eastern were higher than those paid by other airlines with which Mobil maintained it had binding contractual commitments.

Eastern concedes that the increases in product costs (which included the cost of crude oil) after May 15, 1973 were substantial, due primarily to the dramatic rise in crude oil prices imposed by the Organization of Petroleum Exporting Countries (OPEC). Eastern, nevertheless, challenges many of the purported product cost increases claimed by Mobil, arguing that the increases were not *actually* incurred but, rather, were a consequence of Mobil's transfer pricing and accounting system.

These combined circumstances—allegedly improper weighted average price calculations, higher prices based on increased "product costs" that Eastern viewed as nonexistent or impermissible, and higher jet fuel prices vis-a-vis other commercial airlines—led Eastern to file this lawsuit, alleging in counts 1 and 2 that Mobil had overcharged it for jet fuel and that it was entitled to recoup those overcharges. Those counts were brought pursuant to § 5(a) of the Emergency Petroleum Allocation Act ("EPAA"), 15 U.S.C. § 754(a), which incorporates by reference §§ 205, 211 of the Economic Stabilization Act of 1970 ("ESA"), 12 U.S.C. § 1904 note. Under the ESA, an "overcharge" would exist if Mobil had charged a price to Eastern which "exceed[ed] the applicable ceiling [price] under the [mandatory petroleum price] regulations." *See* § 210(c) of the ESA. Moreover, if Eastern's allegations of overcharges were sustained, Mobil would be liable in damages to Eastern in accordance with § 210.

### (I)

■ Eastern and Mobil have filed cross-motions for partial summary judgment on, what they have denominated, the May 15, 1973 "transaction" issue. Simply stated, that issue requires the Court to make the following inquiry: whether Mobil miscalculated its May 15, 1973 weighted average selling prices for Eastern's classes of purchaser at Boston and Syracuse and, if so, whether Eastern is entitled to recover the miscalculations as an "overcharge." For the reasons elaborated below, we conclude that there is no material question of fact with respect to the methodology actually employed by Mobil in computing its transaction prices, that the methodology employed by Mobil yielded May 15, 1973 weighted average prices which comported with applicable federal regulations and, therefore, that Mobil did not miscalculate its May 15, 1973 weighted average selling prices for Eastern's classes of purchaser at Boston and Syracuse. In view of this three-fold conclusion, the Court need not, and does not, discuss in this portion of the opinion the related question of whether Mobil's alleged miscalculations would constitute overcharges.

In setting jet fuel prices pursuant to federal pricing regulations, the parties agree that Mobil's first task was to ascertain Eastern's "class-of-purchaser." As noted above, Eastern does not dispute that Mobil properly placed it in the "class-of-purchaser" for commercial airlines at each of the three airports where Eastern was supplied by Mobil. *See* n.4, *supra*. The next step was to ascertain the "weighted average price at which [jet fuel] was lawfully priced in *transactions* with [Eastern's] class of purchaser ... on May 15, 1973, or if none occurred on that date, in the transaction next preceding May 15, 1973 (emphasis added)." 38 Fed.Reg. 30269 (1973). To identify the relevant "transactions," Mobil was guided by the following definition [5] of what constituted a transaction and when one took place:

> Transaction means an arms-length sale or lease between unrelated persons ... and is considered to occur at the time and place when a binding contract is entered into between the parties.

It is Mobil's application of this definition that Eastern asserts was improper.

---

**5.** This definition of transaction is derived from 38 Fed.Reg. 22538 (1973). *Compare* 10 C.F.R. § 212.31 *with* 39 Fed.Reg. 1924 (1974) (adopting nearly identical definitions).

The undisputed affidavit testimony of Joseph Dougan [6] reveals the manner in which Mobil arrived at its weighted average May 15, 1973 prices for Eastern's jet fuel classes of purchasers. *See* Docket No. 293. First, since a transaction was "considered to occur at the time when a binding contract is entered into," Dougan reviewed the contracts within each commercial airline class of purchaser to determine the contracts "entered into" on or nearest to May 15, 1973. *Id.* at ¶ 6. Although even a one-time spot sale with no written agreement would qualify as a "binding contract," *see* FEA Ruling 1977–5, 3 CCH Energy Mgt. ¶ 16,069 at 16,738–39, Dougan's review revealed that the only sales of jet fuel made by Mobil at the locations involved to the members of the three classes of purchasers in question were pursuant to written, long-term contracts. *See* Docket No. 293 at ¶ 4. Dougan thus ascertained that the commercial jet fuel contracts for each class of purchaser in effect as of May 15, 1973, were as follows:

1) Boston: TWA and Delta Airlines

2) Syracuse: American Airlines

3) Los Angeles: TWA and Flying Tigers.

Dougan further determined that, of these, the following binding contracts were entered into on or nearest preceding to May 15, 1973:

1) Boston—a contract between Mobil and TWA entered into November 20, 1970.

2) Syracuse—a contract between Mobil and American Airlines originally entered into in 1966 but amended effective June 1, 1968.

3) Los Angeles—a contract between Mobil and TWA entered into January 6, 1972.

Having identified the applicable "transaction" contracts, Dougan's second step was to identify "the average price at which [jet fuel] was lawfully priced" pursuant to those contracts "on May 15, 1973." Inasmuch as each of the transaction contracts identified above was a variable-price contract, meaning that the contract price term was computed pursuant to various price escalator clauses, Dougan determined the transaction prices actually in effect most immediately prior to May 15, 1973.[7] *Id.* at ¶¶ 6, 10. These transaction prices, rounded up or down to the nearest one-tenth of one cent, were as follows:

1) Boston—13.4 cents per gallon

2) Syracuse—13.2 cents per gallon

3) Los Angeles—11.1 cents per gallon

Eastern, in contrast with the methodology employed by Mobil, contends that weighted average May 15, 1973 prices should have been computed by reference to the price of *deliveries* of jet fuel occurring on, or most immediately before, May 15, 1973, regardless of when the contracts pursuant to which those deliveries were made had been entered into. Applying this methodology, Eastern arrives at the following "transaction prices;" [8]

1) Boston—delivery to Delta on May 11, 1973, at 12.42 cents per gallon.

2) Syracuse—delivery to American Airlines on May 15, 1973, at 12.525 cents per gallon.

3) Los Angeles—delivery to TWA on May 7, 1973, at 11.10 cents per gallon.

Accepting, *arguendo*, Mobil's increased product cost increments, Eastern then computes the difference between Mobil's allegedly improperly calculated transaction prices and its purportedly correctly calculated transaction prices. For Los Angeles, there was no difference and Eastern, therefore, concedes that, with respect to the Los Angeles' transaction issue, there was no miscalculation. However, with respect to Boston and Syracuse, Mobil's transaction price exceeds that arrived at by Eastern. Taking the difference between these two

**6.** Mr. Dougan's affidavits were based upon his personal knowledge as Manager-Transportation Pricing and Special Products Pricing of Mobil's North American Division.

**7.** Since at each airport location only one contract was entered on the date nearest to May 15, 1973, no weight averaging of prices was necessary.

**8.** These prices were derived from Form CO–1663s which summarize daily delivery invoices.

transaction prices for Boston (13.4 cents minus 12.42 cents) and for Syracuse (13.2 cents minus 12.525 cents), Eastern multiplies the differences by the number of gallons of jet fuel sold at Boston (33,223,000 gallons) and Syracuse (2,428,000 gallons), respectively, for the one-year mandatory supply period, and arrives at the amount by which Mobil allegedly miscalculated its prices to Eastern. Eastern maintains this miscalculation, totaling $341,970, constitutes an overcharge which it is entitled to recoup under § 210 of the ESA.

Mobil concedes that at one time there was FEA support for Eastern's "delivered-price" methodology. Indeed, FEA Ruling 1977–5, which explained in detail how the "transaction" definition was to be applied to written variable-price contracts, was consistent with the methodology that Eastern asserts should have been used. However, since the issuance of Ruling 1977–5, that ruling has been declared "void *ab initio*" in litigation in the United States District Court for the Northern District of Texas, *see Exxon Corp. v. Department of Energy*, (N.D.Tex.1979), and has, in pertinent part, been rescinded by the Department of Energy (hereinafter "DOE") in Ruling 1979–1.

Having carefully reviewed Ruling 1979–1, and according that Ruling the deference due an administrative agency's interpretation of its own regulations, *see Cities Service Company v. F.E.A.*, 529 F.2d 1016, 1022–23 (Em.App.1975), we are compelled to conclude that the methodology which Mobil should have used in selecting the correct transaction price was a three-step process. First, Mobil should have identified the jet fuel contract (the transaction contract) entered into on or most immediately preceding May 15, 1973, with a commercial airliner in Boston and Syracuse. Second, Mobil should have determined the contract price on May 15, 1973, under the relevant transaction contract. Finally, when a variable-price contract is involved, as is the case here, Mobil should have identified the delivery under the relevant transaction contract which occurred on or most immediately prior to May 15, 1973. This is because, according to the Ruling, it is the contract price on the date of that delivery which is to be the transaction price.[9]

Applying these three steps to Eastern's classes of purchaser at the Boston and Syracuse airports reveals that transaction prices computed pursuant to Ruling 1979–1 do not differ from the transaction prices actually utilized by Mobil. In Boston, for instance, the applicable transaction contract, dated November 20, 1970, was between Mobil and TWA. The delivery, under that contract, which occurred on or most immediately prior to May 15, 1973, took place on May 9, 1973. As set forth in the undisputed Dougan affidavit, *see* Docket No. 293 at ¶ 8, the contract price for that delivery date was $.134. Similarly, in Syracuse, the applicable transaction contract, originally entered into in 1966, but amended effective June 1, 1968, was between Mobil and American Airlines. As set forth in the undisputed Dougan affidavit, *id.* at ¶ 9, the relevant delivery date

---

**9.** The Ruling further provides that, "if no such deliveries occurred, the transaction price is the price that would have been charged under the contract had a sale occurred on the day the contract was entered into." This is an example of what Eastern and DOE refer to as an "imputed price." Eastern, in its summary judgment memoranda, devotes considerable effort arguing that Mobil "impute[d] fictional May 15, 1973 [transaction] prices," *see* Docket No. 300 at 5, as well as attempting to demonstrate that, if imputed prices were to be used, the proper transaction price was to be determined by reference to the contract price on the date the contract was entered into, *see id.* at 7–9. In the Court's view, these arguments simply miss the mark for at least two related reasons.

First, Eastern misconceives and misstates what Mobil purportedly did in computing its transaction prices. There is, for instance, nothing in the two Dougan affidavits, or in any other portion of the record reviewed by the Court, suggesting that Mobil used "imputed" transaction prices. Similarly, Eastern simply ignores and, significantly, for purposes of this summary judgment issue, has failed to materially dispute the factual allegations contained in Dougan's Second Affidavit that actual deliveries were made under the relevant transaction contracts in Boston and Syracuse and that the contract prices for those deliveries were identical to those used by Mobil in computing the contested transaction prices.

was May 15, 1973, and the contract price for that delivery was $.132.[10]

In sum, the Court concludes that Mobil's May 15, 1973 transaction prices, computed for Eastern's classes of purchaser at the three airports involved here, comport with Ruling 1979–1 and were, therefore, properly determined. Summary judgment on the May 15, 1973 transaction issue will thus be entered in favor of Mobil.

(II)

Eastern maintains that Mobil has engaged in "price discrimination" by giving some commercial airlines in its class-of-purchaser more favorable jet fuel prices, the difference constituting "overcharges" to Eastern. A review of the parties' statements of undisputed material facts, filed in support of their respective cross-motions for partial summary judgment on the "price discrimination" issue, reveals that Eastern was indeed charged prices greater than those charged to Transworld Airways (hereinafter "TWA") at Boston from April 1974 through October 1974, and at Los Angeles during September and October 1974. The uncontested sum of the price discrepancies totalled $1,175,495.00 for the periods in question. Mobil contends that the sole reason for the discrepancy was that TWA had a valid contractual price commitment from Mobil. Under the mandatory petroleum price and allocation regulations, Mobil was required to honor such a commitment unless the contract terms resulted in prices higher than those resulting from application of the regulations. *See, e. g., Air Transport Ass'n v. FEO*, 382 F.Supp. 437 (D.D.C.1974); *aff'd* 520 F.2d 1339 (Em.App.1975). Eastern does not dispute that price discrepancies within a class of purchaser pursuant to preexisting

contracts are valid, but argues that Mobil's contracts with TWA had actually expired.

The Court need not reach the contract expiration question, however, since for reasons discussed below we conclude, first, that the undisputed price discrepancies simply have no relevance to the issue of statutory "overcharges" under §§ 210(b), (c) of the ESA and; second, that even when liberally construed, counts 1 and 2 of Eastern's complaint do not set forth an independent claim for relief from price discrimination under § 210(a) of the ESA. Summary judgment on the "price discrimination" issue will thus be entered in favor of Mobil.

■ At the outset, the gravamen of counts 1 and 2 of Eastern's complaint need be recalled, that is, that Mobil *overcharged* Eastern for jet fuel in violation of mandatory petroleum price regulations and that Eastern is entitled to recoup the amount of such *overcharges*. The narrow statutory definition of "overcharge" compels us, however, to question the very relevance of Eastern's assertion that Mobil discriminated in prices between Eastern and TWA. As noted above, § 210(c) of the ESA narrowly defines "overcharge" as:

"the amount by which the consideration for . . . the sale of goods . . . exceeds the applicable ceiling [price] under the [mandatory petroleum price] regulations."

According to this definition, Eastern cannot establish an "overcharge" by Mobil unless Mobil's alleged discriminatory prices exceeded the applicable ceiling price. If then, Eastern is claiming on the one hand that, as a result of the alleged discrimination, it was charged more than the maximum lawful selling price for jet fuel, fuel

10. Eastern would have the Court disregard the contract price of $.132 and look only to the invoiced price of $.125 recorded on a Form CO–1663. Mobil has consistently maintained that this invoice price was a clerical error and Eastern has not disputed that fact. Eastern, nevertheless, argues that the invoice price and not the contract price determines the transaction price, and Eastern computes "overcharges" based on this difference. Inasmuch as the Court finds Eastern's position to be plainly at odds with notions of administrative fairness,

*see* Shell Oil Co., Interpretation 78–2, 43 Fed. Reg. 12848 (1978), and since Eastern's approach would not result in transaction prices accurately reflecting the May 15, 1973 market price of the petroleum product involved, an extended discussion of this issue need not be undertaken. Suffice it to note that, in the Court's view, Eastern's position is simply without merit, thereby posing no barrier to granting summary judgment in Mobil's favor on the "transaction" issue.

prices charged purchasers other than Eastern simply are irrelevant. If, on the other hand, Eastern is claiming that, although Mobil's prices to Eastern were below the ceiling, its prices to other airlines were even lower and that Eastern was discriminated against to that extent, a statutory "overcharge" would nevertheless not exist. Thus, in any event, the prices charged purchasers other than Eastern are irrelevant to the inquiry concerning the overcharge allegation raised in counts 1 and 2.

In its summary judgment memoranda, Eastern for the first time apparently recognizes that its claims for damages measured by the TWA-Eastern price discrepancy may not be an "overcharge." See Docket No. 276 at 37. It argues alternatively that the provisions of § 210(a) of the ESA [11] allow it to collect damages for price discrimination without regard to whether an "overcharge," as defined in § 210(c), is established. Id. at 37–39. The Court, as did Mobil in its reply memorandum, see Docket No. 291 at 62, acknowledges that under § 210(a) an action might lie for discriminatory preferences which frustrate the purposes of the EPAA. See Newman Oil Co. v. ARCO, 597 F.2d 275 (Em.App.1979). Specifically, it is arguable that Eastern could maintain a damage action for competitive injury stemming from price discrimination under the allocation rules. See 10 C.F.R. § 210.62. The fact is, however, that counts 1 and 2 of Eastern's complaint, even when liberally construed as required under the Fed.R.Civ.P., simply do not set forth a claim of damages for competitive injury. As indicated previously, the sole claim for relief set forth in those counts, which Eastern has not sought to amend since this suit was filed in 1974, is an action to recover alleged statutory "overcharges."

### (III)

Asserting that it can show by affidavit proof the jet fuel prices charged Eastern were substantially below the applicable "ceiling" price and, therefore, that no genuine issue of overcharge exists, Mobil has moved for partial summary judgment on counts 1 and 2. Alternatively, Mobil argues that, if the Court concludes the "ultimate overcharge issue" in counts 1 and 2 is not ripe for summary judgment, there are no genuine issues of material fact with respect to eight specific regulatory claims asserted by Eastern and that, as to those claims, Mobil is entitled to summary adjudication.

Based upon an exhaustive examination of the counter-affidavits filed by the parties concerning the ultimate overcharge issue, and for reasons discussed below, the Court is persuaded that Mobil is entitled to summary judgment with respect to counts 1 and 2. Although this disposition arguably makes it unnecessary to consider the specific regulatory issues as to which Mobil has moved in the alternative, in our view, resolution of those issues will have the salutary effect of preliminarily narrowing the number of areas in which there is some question as to whether Mobil miscalculated its prices or misapplied the applicable pricing regulations.[12]

### Regulatory Issues

Mobil originally moved for partial summary judgment on eight discrete regulatory issues. Due to the fact the parties have stipulated that there is no longer any dispute on certain issues, see Docket No. 318,

---

11. § 210(a) provides in pertinent part that "[a]ny person suffering legal wrong because of any act or practice arising out of this title, or any order or regulation issued pursuant thereto, may bring an action ... for appropriate relief, including an action for ... damages."

12. The Court is keenly aware of the constitutional, jurisprudential and pragmatic considerations which militate against issuance of advisory opinions. We do not regard our discussion of the discrete regulatory issues to be in the nature of an advisory opinion. Rather we believe those issues—many of which were raised at the inception of this litigation in 1974 and repeatedly afterward in the context of discovery—to be ripe for disposition. Moreover, by undertaking resolution of all the issues subsumed within counts 1 and 2, the necessary finality will exist to certify counts 1 and 2 to T.E.C.A. upon proper request of a party. See F.R.C.P. 54(b). There would remain no other issues in this action reviewable by T.E.C.A. See Longview Refining Co. v. Shore, 554 F.2d 1006 at 1009 n.5.

and because the Court has previously disposed of the "transaction" and "price discrimination" issues, only three regulatory issues require our further consideration.

### (A)

### *Maintenance of Adequate Records*

10 C.F.R. § 210.92 required Mobil to "keep such records as are sufficient to demonstrate that the prices charged . . . by [Mobil were] in compliance with the requirements of [the mandatory petroleum price control regulations]." Eastern maintains that it "intends to prove [at trial] that Mobil increased Eastern's jet fuel prices without even rudimentary record support as required, and that such price increases constitute *per se* overcharges." Mobil, in opposition, contends that at all times it "maintained those records required by government price control regulations, and *ipso facto*, all records necessary to show that its price increases are in compliance with the government price control regulations."

■ Clearly, there is a factual dispute as to whether Mobil actually maintained the records required by 10 C.F.R. § 210.92. However, in our view, the dispute does not concern "material" facts and we hold that, as a matter of law, Mobil is entitled to summary judgment on the record-keeping charge for two reasons. First, Eastern has failed to identify any statute or regulation, 10 C.F.R. § 210.92 notwithstanding, that creates a right of action in a purchaser to recover damages for alleged inadequate record maintenance.[13] To assume that such a right of action necessarily follows from the regulatory requirement that Mobil maintain records is to confuse the issue of Mobil's *obligation* with the distinct issue of whether an aggrieved purchaser has a *remedy* for an alleged violation of that obligation.

Second, even assuming a right of action existed, Eastern, in its pleadings, has simply not set forth such a claim for relief. As discussed previously, the sole claim made in counts 1 and 2 is that Mobil *overcharged* Eastern. Insofar as Eastern asserts that price increases predicated on inadequate or non-existent records constitute *per se* overcharges, there is explicit appellate authority to the contrary. See *Longview Refining Co. v. Shore*, 554 F.2d 1006 (Em.App.1977). Eastern, not Mobil, has "the burden . . . to provide the specific data needed to prove the existence of an overcharge." *Id.* at 1011. To accomplish this, Eastern has at its disposal the various means of discovery provided by the Federal Rules of Civil Procedure. Moreover, as the Court has stated, and as our previous rulings in this case clearly indicate, we have no hesitancy in imposing sanctions, including citation for contempt, upon a party who fails to fully comply with legitimate discovery requests.

### (B)

### *Posted Prices*

■ As discussed above, 10 C.F.R. § 212.-82(b) permitted a refiner, such as Mobil, to charge the weighted average May 15, 1973 price for the product involved plus an increment based upon "increased product costs" incurred by the refiner since May 15, 1973. There is no dispute here that "product costs" include the acquisition cost of crude oil. During the mandatory supply period, however, the relevant regulatory provision provided that, a refiner's "cost of crude oil," for purposes of domestic crude oil "in transactions between affiliated entities" means "the posted price."[14] 10 C.F.R. § 212.83(b). Mobil has consistently contended that its "producing" and "refining" divisions are "affiliated entities" and, therefore, that when it transferred domestically produced crude oil from the "producing" to the "refining" division, the crude oil was properly costed at the "posted price." Eastern has just as consistently maintained that Mobil's use of "posted prices" in computing in-

---

**13.** We intimate no view as to whether such an action would lie under § 210(a) of the ESA.

**14.** "Posted price" is defined as a "written statement of crude oil prices circulated publicly among sellers and buyers of crude oil in a particular field in accordance with historic practices, and generally known by buyers in the field." 10 C.F.R. § 212.31.

creased product costs was unlawful, inasmuch as "posted prices" include profits and represent something other than actual extraction costs. It is Eastern's position that crude oil transferred from Mobil's producing division to its refining division must be valued at what it terms "actual costs" for purposes of computing allowable "passthrough costs."

Eastern initially argued that a transfer between Mobil's divisions did not constitute a "transaction between affiliated entities" and, therefore, the plain language of the "posted price" regulation did not apply. Recognizing that Eastern's contention raised issues appropriate for initial review and resolution by the agency charged with administering the regulations involved, the Court, by Order dated November 20, 1975,[15] stayed these proceedings and submitted the matter to the FEA for an official interpretation.

In an Interpretation issued April 30, 1976, the FEA's Office of General Counsel rejected Eastern's arguments, finding "no rational basis" for Eastern's limited view of "affiliated entities" and affirming that term's reference to different unincorporated divisions within a company. Eastern's administrative appeal of the Interpretation to FEA's Office of Exceptions and Appeals was similarly unavailing. Despite the FEA's emphatic rejection of its position, Eastern continues to press its argument here.

■ In assessing the merits of Eastern's argument, the Court is constrained to accord considerable deference to the FEA Interpretation. It is well established that an agency's own interpretation of a statute or regulation is entitled to be given great weight by a court unless plainly erroneous or patently inconsistent with the regulation. *See Udall v. Tallman*, 380 U.S. 1, 11–17, 85 S.Ct. 792, 798–801, 13 L.Ed.2d 616 (1965). In its efforts to discredit FEA's Interpretation, Eastern does not address the merits of the Interpretation but, rather, argues that the Interpretation is entitled to no weight

because Mobil "failed to submit" certain "significant facts" in its request for interpretation. The Court has reviewed these purported "significant facts" and, with one exception, they are so lacking in substance . that they merit no discussion here.

■ Eastern is correct in its argument that the FEA did not have before it the actual "posted prices" used by Mobil. Thus, while the Interpretation does stand for the proposition that Mobil was entitled to *use* "posted prices" in its computation of increased product costs, it did not dispose of the quite separate issue of whether Mobil *correctly calculated* its posted prices. With respect to the latter issue, in our view, the cursory Choate affidavit, *see, e. g.,* ¶¶ 10, 11, is insufficient to resolve the factual dispute as to Mobil's compliance with the regulations governing correct computation of "posted prices." Summary judgment on that issue is, therefore, inappropriate at this juncture. However, insofar as Mobil seeks partial summary judgment on the former issue, the Court is persuaded that it should defer to the FEA Interpretation. Partial summary judgment will, therefore, be entered holding that it was proper for Mobil to use "posted prices" for inter-affiliate transfers of domestically produced crude oil. We express no view as to whether Mobil properly computed those "posted prices."

## (C)
### *Landed Costs*

With respect to transactions between affiliated entities, the applicable regulations required that increased product costs, for passthrough purposes, were to be computed by reference to the "landed cost" of imported crude oil. 10 C.F.R. § 212.83(b). That term was defined as "the costs of the product and the transportation both computed by use of the customary accounting procedures generally accepted and consistently and historically applied by the firm concerned." *Id.* This parallels the approach used for domestic crude oil valuation which, as we have seen, is at "posted prices."

15. *See* Docket No. 120.

Eastern has conceded that, insofar as affiliated entities were involved, Mobil was entitled to use. "landed costs" in computing "increased product costs." However, as with the "posted price" issue, Eastern maintains that Mobil has not properly computed its "landed costs." In view of Eastern's concession on the use of "landed costs," partial summary judgment on that sub-issue will be entered. Having reviewed the cursory Choate affidavit, *see* ¶¶ 10, 11, we are unpersuaded that a material factual dispute does not exist as to Mobil's compliance with the regulations governing computation of the "landed cost" of crude. Accordingly, insofar as Mobil sought summary adjudication on that sub-issue, we deem summary judgment to be inappropriate at this juncture.

### The Ultimate Overcharge Issue

The gravamen of counts 1 and 2 of Eastern's complaint is that Mobil overcharged for jet fuel during the mandatory supply period. It is essential to bear in mind that § 210(c) of the ESA defines "overcharge" as follows:

"the amount by which the consideration for . . . the sale of goods . . . *exceeds the applicable ceiling [price]* under the [mandatory petroleum price] regulations (emphasis added)."

In light of this definition, we view the "ultimate overcharge issue" as neither whether Mobil used the proper formulae in arriving at lawful prices to Eastern nor whether Mobil calculated its lawful prices in a proper manner. Rather, the "ultimate overcharge issue" is whether the prices Eastern paid to Mobil for jet fuel during the mandatory supply period exceeded the "ceiling" or "maximum lawful" price established by the applicable mandatory petroleum price regulations. This limitation on causes of action for aggrieved purchasers of petroleum products is settled law. In the leading case on this point a defendant refiner's accounting staff was so overwhelmed and confused by the pricing regulations that it gave up all efforts to comply and merely continued to establish prices according to prior market-related criteria. In rejecting a private suit under the EPAA and § 210 of the ESA against this refiner, the Temporary Emergency Court of Appeals held:

Mere failure of a defendant to perform the mechanical calculations under the formula in arriving at the price charged for covered products does not in and of itself result in an overcharge, *i. e.*, the sale of a covered product at a price which "exceeds the applicable ceiling" [§ 210(c)] price. The price actually charged (however arrived at) may be below the ceiling price, so a plaintiff would suffer no legal wrong entitling him to relief under § 210 of the Stabilization Act, which was adopted by § 5(a) of the Allocation Act.

\* \* \* \* \* \*

[M]ere failure to employ the formula in the process of arriving at prices would not constitute a legal wrong under § 210 of the Stabilization Act for which plaintiffs can recover. It is . . . charging a price . . . in excess of the applicable ceiling price allowable under the regulations containing the formula which would constitute a[n] . . . overcharge.

*Longview Refining Co. v. Shore*, 554 F.2d 1006, 1017–18, 1022 (Em.App.), *cert. denied*, 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977).

We have discussed at length elsewhere the basic regulatory framework which established the "maximum allowable" or "ceiling" price for jet fuel sold to Eastern. *See infra* at 3–4. To briefly recapitulate, the regulations set as a "maximum allowable" price the sum of the prices established in the marketplace on May 15, 1973, plus increased costs incurred since that date. With respect to those increased costs, 10 C.F.R. § 212.83(d) established a mechanism known as "banking" which permitted a refiner to recover (through price increases) in subsequent months those costs which the refiner had previously failed to recover. Thus, for any given month, a refiner's maximum prices consisted of at least three elements: (1) the weighted average May 15, 1973 transaction price, (2) the product cost

increases incurred in the immediately preceding month, and (3) "banked" costs—the product cost increases which had not been recovered in months before that. Moreover, because the regulations afforded refiners the discretion to allocate their "banked" costs among various general refinery product categories, a refiner, such as Mobil, was permitted to recover all its unrecovered increased costs by increasing its jet fuel prices to jet fuel purchasers such as Eastern. *See Air Transport Ass'n v. FEO, supra* at 442.

■ Mobil asserts that the maximum permissible jet fuel prices, which Eastern must prove were exceeded to establish an "overcharge," necessarily included all available "banked" costs. Stated differently, Mobil contends that, to the extent "banked" costs were in existence during the mandatory supply period, the prices paid for jet fuel were necessarily less than the maximum lawful price by an amount corresponding to those "banked" costs. Proceeding from that premise, Mobil seeks to demonstrate, by affidavit proof, that during the 12-month mandatory supply period, it maintained a substantial amount of "banked" costs in the general refinery product category. Since these "banked" costs could have been used to increase jet fuel prices above those actually charged, Mobil argues that the prices paid by Eastern for jet fuel were necessarily less than the "ceiling price" and, therefore, that it is entitled to summary judgment on the ultimate overcharge issue.

Eastern, in response, mounts what is essentially a three-pronged attack on Mobil's argument. First, while conceding that Mobil "had freedom initially to allocate all or any part of its 'banks' to jet fuel," Eastern argues that "retroactive use of banks" to avoid liability for overcharges is not allowable under the regulations. *See* Docket No. 277 at 3. Significantly, Eastern cites to no regulatory provision in support of its theory that "banked" costs cannot be considered in ascertaining whether an "overcharge" occurred. Rather, the sole authority it presents is the administrative decision in *Tenneco Oil Company,* 1 DOE ¶ 82,512 (Nov. 15, 1977), citing that decision for the proposition that Mobil cannot now point to its unused banks during the months of the mandatory supply period to offset any possible miscalculations which may now be found to have occurred during those same months.

Having carefully reviewed *Tenneco,* we must agree with Mobil that that administrative decision decidedly does not support the proposition urged by Eastern. Moreover, whatever else *Tenneco* may stand for, it is readily distinguishable from the salient facts and issues here because it addresses the application of regulatory provisions relevant only to gasoline and different from those applicable to jet fuel. For that reason alone, Eastern's reliance on *Tenneco* is misguided. Finally, we conclude that the proposition urged by Eastern is clearly at odds with the acknowledged "smoothing-out" role played by "banked" costs, *see Standard Oil Co. of Ohio v. Federal Energy Administration,* 612 F.2d 1291 (Em.App. 1979), as well as language in *Longview Refining Co. v. Shore, supra* at 1017, suggesting "banked" amounts are available to offset subsequent determinations that prices were miscalculated.

Equally untenable is Eastern's second line of attack—the so-called "fluid shield" theory. Under this theory Eastern complains that no private plaintiff could ever recover for overcharges unless its alleged amount of overcharges exceeded the sum of Mobil's "banked" costs. This would permit Mobil, in Eastern's view, to assert the same "bank" amounts to offset many different allegations of overcharge. While possessing a degree of intuitive appeal, Eastern has adduced no evidence whatsoever to suggest that Mobil has impermissibly benefited from "banked" costs twice or more. Unless Eastern makes a specific evidentiary proffer of pricing miscalculations or other misapplications of the pricing regulations that will seriously deplete or exhaust Mobil's "banked" costs, the existence of those unrecouped "banked" costs will be sufficient to insulate Mobil from Eastern's claims of overcharges.

In an effort to make such a showing, Eastern, in its third and main attack, reviews certain Notices of Proposed Violations (hereinafter "NOPVs") issued by DOE, asserting that Mobil made pricing miscalculations which would affect the amount of Mobil's "banked" costs. Eastern does so in an attempt to demonstrate that there are genuine material factual issues as to whether Mobil's "banked" costs would be sufficient to offset any regulatory miscalculations.

Mobil correctly argued that Eastern's initial efforts were deficient. This is because, as Mobil noted, Eastern had failed to particularize the alleged miscalculations so that the Court could determine which, if any, of the amounts covered by the NOPVs would affect the general refinery products "bank" (hereinafter "grp bank") for the one-year period with which we are concerned. Mobil, in its memoranda, *see* Docket No. 292, undertook this particularized examination, attempting to demonstrate that all of the NOPVs relevant to this lawsuit amount to under $20 million, which is insufficient to deplete Mobil's "grp bank" exceeding $40 million. However, because the question of exhaustion of "banked" costs was the crucial issue before the Court, and since that issue was in a summary judgment posture, the Court concluded that the issue could not be resolved without submission of affidavits. *See* Fed.R.Civ.P. 56(a), (e).

Pursuant to the Court's request, Mobil has submitted two affidavits of William C. Streets which set forth figures derived from the most current FEO–96 filings for the twelve month period in question, demonstrating that Mobil's cumulative "grp bank" ranged from $1.2 million in November 1973 to $43.3 million in June 1974. By assuming for purposes of the affidavit that all the allegations of the *pertinent* NOPVs would be proven, Mr. Streets identified what effect the NOPVs would have on Mobil's "grp bank" of unrecouped costs. Under Mr. Streets' "worst case" scenario, he estimated that the total impact of the pertinent outstanding NOPVs on Mobil's "grp bank" would be approximately $15 million, not nearly sufficient to deplete the $43 million cumulative balance. Simply stated, Mr. Streets assumed facts most favorable to Eastern—the party opposing summary judgment—and then demonstrated that there is no material factual dispute as to whether Mobil's "banked" costs for the mandatory supply period would be sufficient to insulate it from Eastern's claims of overcharge.[16]

Eastern, in counter-affidavits, neither quarrels with the general regulatory analysis employed by Mr. Streets nor has it sought to adduce any specific evidence that miscalculations made in pricing jet fuel to Eastern (e. g. miscalculations in "posted prices" or "landed costs") would be sufficient to deplete Mobil's "grp bank" of unrecouped costs. Rather, the affiant, Lawrence C. Jensen, asserts that Streets' analysis must be extended in essentially three ways and that, if these three analyses are made, the aggregate effect of the NOPVs on Mobil's "grp bank" would be approximately $49.6 million.

The Court has examined each of the analytical extensions urged by Mr. Jensen. With the exception of the extrapolation process, which the Court concludes is inappropriate in fact and as applied, we have applied the analytical extensions. Notwithstanding these analyses, we conclude that there is no *material* factual dispute here as to whether Mobil's "banked" costs for the mandatory supply period are sufficient to insulate it from Eastern's claims of overcharge. Stated differently, we conclude that even if Eastern could establish the *pertinent* instances alleged in the NOPVs in which Mobil allegedly erred in making some calculation or application of the pricing regulations, the amounts established would not be enough to exhaust Mobil's very substantial "grp bank" of unrecouped costs. Sum-

**16.** This mode of analysis is an entirely appropriate basis for decision on a motion for summary judgment. *See, e. g., Adickes v. S. J. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Westchester Corp. v. Peat, Marwick, Mitchell & Co.*, 626 F.2d 1212, 1213 (5th Cir. 1980).

mary judgment in favor of Mobil on the ultimate overcharge issue is, therefore, warranted.

(IV)

For the foregoing reasons, it is

ORDERED AND ADJUDGED as follows:

1. Mobil's cross-motion for partial summary judgment on the May 15, 1973 transaction issue is GRANTED. Eastern's cross-motion on the same issue is DENIED.

2. Mobil's cross-motion for partial summary judgment on the price discrimination issue is GRANTED. Eastern's cross-motion on the same issue is DENIED.

3. Mobil's motion for partial summary judgment on discrete regulatory issues is GRANTED in part and DENIED in part as follows:

(a) Mobil's motion for partial summary judgment on the record-keeping charge is GRANTED in its entirety;

(b) Insofar as Mobil seeks partial summary judgment on the propriety of using "posted prices" and "landed costs" in calculating increased product costs, the motion for partial summary judgment is GRANTED. However, insofar as Mobil seeks summary adjudication that it properly computed its "posted prices" and "landed costs," the motion for partial summary judgment is DENIED.

4. Because Eastern has failed to demonstrate the existence of a genuine fact material to the ultimate overcharge issue, Mobil's motion for partial summary judgment with respect to counts 1 and 2 is hereby GRANTED.