**EASTERN AIR LINES, INC., Plaintiff,**

v.

**MOBIL OIL CORPORATION, Defendant.**

**No. 74–765–Civ–SMA.**

United States District Court,
S.D. Florida,
Miami Division.

April 27, 1983.

James H. Bratton, Jr., Atlanta, Ga., William G. Bell, Jr., EAL, Inc., Laurence A. Schroeder, Walton, Lantaff, Schroeder & Carson, P.A., David S. Batcheller, Smathers & Thompson, Miami, Fla., for plaintiff.

Frank Rowen, New York City, Andrew J. Kilcarr, Washington, D.C., Thomas R. Trowbridge, New York City, David S. Engels, Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

ARONOVITZ, District Judge.

This matter comes before the Court upon remand from the Temporary Emergency Court of Appeals (TECA) for consideration of a claim by Eastern Air Lines, Inc. ("Eastern") for price discrimination under § 210(a) of the Economic Stabilization Act of 1970 (the "ESA"), see 12 U.S.C. § 1904 note, as incorporated into the Emergency

Petroleum Allocation Act of 1973 (the "EPAA"), see 15 U.S.C. §§ 751–757. Eastern seeks damages in the amount of $1,175,495.00, or the difference in the price charged Eastern and Trans World Airlines, Inc. ("TWA") by Defendant Mobil Oil Corporation ("Mobil") during the mandatory petroleum allocation program in effect from November 1, 1973 through October 24, 1974.

In its prior adjudication, this Court granted Mobil's Cross-Motion for Partial Summary Judgment on the issue of overcharges, defined in § 210(c) of the ESA, holding that Eastern had failed to establish that the prices charged it for jet fuel were in excess of the maximum allowable price permitted under the price regulations. *Eastern Airlines, Inc. v. Mobil Oil Corp.*, 512 F.Supp. 1231 (S.D.Fla.1981). TECA affirmed that decision but remanded it with directions that Eastern be allowed to amend its complaint to assert a claim for price discrimination under § 210(a) of the ESA. *Eastern Airlines, Inc. v. Mobil Oil Corp.*, 677 F.2d 879 (Em.App.1982). Eastern has done so, and both parties have stipulated that the salient facts and circumstances relating to that claim are not in material dispute. The matter is now before the Court upon the parties' Cross-Motions for Summary Judgment. The issues raised by the cross-motions have been comprehensively briefed and the Court has heard oral argument from respective counsel.

█ The Court will first consider the issue as to whether or not Eastern has properly founded a claim of price discrimination under § 210(a) of the ESA. While under some circumstances such a claim may properly lie, disparate prices charged for jet fuel to two airlines during a mandated supply relationship with a refiner do not constitute price discrimination *per se*. In the course of reaching this finding, the Court will treat both the "single increment rule" and the "equal application rule" set forth in the price regulations as applied to the arguments advanced by both parties. These rules, especially the equal application rule, will be referred to throughout the opinion.

Separately and severally, the Court will address the issue of whether or not a contract between Mobil and TWA serves as an independent ground upon which to rule in Mobil's favor. This Court finds that, under the facts of this case, such a contract did remain in effect during the mandatory supply relationship, entitling Mobil to charge TWA for jet fuel pursuant to the price term of that contract, even though this resulted in lower prices.

*Factual and Regulatory Background*

The disruption in oil supplies caused by the Middle East oil embargo prompted the establishment of a mandatory petroleum allocation program in 1973 pursuant to the EPAA. Eastern became a mandated purchaser of jet fuel from Mobil between November 1, 1973 and October 24, 1974, at Boston, Mass., Los Angeles, Cal., and Syracuse, N.Y. The program required Eastern to abridge its existing contracts with other suppliers and to resume purchasing fuel from Mobil, its 1972 supplier. Prices for jet fuel for this period were controlled by federal mandatory petroleum price regulations that set a ceiling on prices a refiner could charge, but did not dictate the actual prices themselves. 10 C.F.R. §§ 212.81–88. The price regulations promulgated by the Federal Energy Administration (the "FEA") on January 14, 1974,[1] provided that a refiner could not charge to any class of purchaser (defined as "similarly situated customers," 10 C.F.R. § 212.31) a price in excess of a "maximum lawful price", which represents the sum of the "base price" and "increased product costs."

The "base price" is the weighted average price at which the product was lawfully priced in transactions with a particular class of purchaser on May 15, 1973. 10 C.F.R. § 212.81(f). "Increased product costs" equal the sum of net increases over May,

1. The FEA substantially adopted the regulations of the pricing program administered by the Cost of Living Council.

1973 costs for purchases of domestic and foreign petroleum products for resale. 10 C.F.R. § 212.83(b)(c). Allocation of these increased costs is divided among products of two categories: "special products" and "other than special products".

Each "special product", a term describing gasoline and No. 2 heating oil among others, may be allocated, at a maximum, the increased product costs proportionate to its percentage of the refiner's sales. 10 C.F.R. § 212.83(c)(i). Allocation of costs among "other than special products", a category including jet fuel, is left entirely to the discretion of the refiner. He is permitted to increase the May, 1973 price of jet fuel by apportioning the total amount of his increased costs, both for products of that category and "special products", to the extent he chooses not to allocate to the latter their proportionate share. 10 C.F.R. § 212.83(c)(ii). The allocation of increased costs is subject to the restriction, however, that such costs that are included in computing the maximum allowable price of a particular covered product other than a special product be applied equally to each class of purchaser. Thus, the aggregate increment of increased costs allocated to a product must be passed through equally in determining the maximum allowable price that may be charged to each class of purchaser of that product. 10 C.F.R. § 212.83(c)(ii).

Where a refiner charges some classes of purchaser less than the maximum lawful price in transactions during a particular month because of contractual commitments, FEA regulations permit the difference between the maximum lawful price and the lower price actually charged to be treated as "unrecovered costs" available for pass-through in subsequent months. These "banked costs" may then be used to calculate the maximum lawful price in subsequent months provided that they also are applied equally to each class of purchaser in

2. The prices charged at Syracuse Airport during this period are not relevant to this dispute.

3. This Court, in its opinion on the original complaint alleging overcharges, stated that "under

computing maximum lawful prices in that month. 10 C.F.R. § 212.83(d).

Eastern and TWA composed a "class of purchaser" during this period at both the Boston and Los Angeles airports.[2] At the onset of the allocation program on November 1, 1973, TWA, unlike Eastern, was covered by a contract with Mobil, its 1972 supplier. Under the price regulations, a refinery was allowed to continue its contractual relations with those customers it had supplied in 1972, and could adjust prices according to the terms of the contract as long as it did not charge above the maximum price to be computed under the regulations. Prices pursuant to a contract were valid even if they resulted in a disparity among prices charged to members of the same class. 10 C.F.R. § 212.83(d).

Eastern was charged more than TWA for jet fuel between April 1, 1974 and October 31, 1974, at Boston and between September 1, 1974 and October 12, 1974 at Los Angeles. Eastern claims that the contract between Mobil and TWA had expired by its terms on December 31, 1973, and that the regulations provide no legal basis, other than a preexisting contract, for price discrimination among members of the same class of purchaser. It maintains that discriminatory pricing among mandated, non-contract customers within the same class is *per se* illegal, and entitles the aggrieved party to consequential damages in the sum of the amount of the difference between the prices charged.

I

## CAN AN ACTION LIE FOR PRICE DISCRIMINATION UNDER SECTION 210(a)?

■ Before the Court considers the merits of Eastern's claim, the issue of whether an action may lie for price discrimination under § 210(a) of the ESA must first be addressed.[3] Section 210(a) of the ESA states, in pertinent part:

§ 210(a) an action *might* lie for.discriminatory preferences which frustrate the purposes of the EPAA." 512 F.Supp. at 1239. TECA expressed no view regarding the merits of the

Any person suffering legal wrong because of any act or practice arising out of this title, or any order or regulations issued pursuant thereto, may bring an action in a district court of the United States, without regard to the amount in controversy, for appropriate relief including ... damages.

This section was designed to afford a private right of action as a supplementary means of enforcing the Act, *Sobel Paper & Wire Co. v. Great Atlantic & Pacific Tea Co.,* 343 F.Supp. 386, 389 (E.D.Pa.1972), and has been incorporated into the EPAA for the same purpose. TECA "has broadly interpreted § 210(a) of the ESA to allow the recovery of any damages arising from any legal wrong, and has interpreted § 210(b) as creating a special remedy for overcharges rather than a limit on damages available under § 210(a)." *Newman Oil Co. v. Atlantic Richfield Co.,* 597 F.2d 275, 279 (Em.App. 1979). *See also, Sobel,* 343 F.Supp. at 389. ("legal wrong" within the statute [210(a)] is a more encompassing concept than "overcharge.")

The legal wrong alleged here is said to arise out of 10 C.F.R. § 210.62(b) which states in its entirety:

(b) No supplier shall engage in any form of discrimination among purchasers of any allocated product. For purposes of this paragraph "discrimination" means extending any preference or sales treatment which has the effect of frustrating or impairing the objectives, purposes and intent of this chapter or of the Act, and includes, but is not limited to, refusal by a retail marketer of motor gasoline or diesel fuel to furnish or sell any allocated product due to the absence of a prior selling relationship with the purchaser, or establishment of new volume purchase arrangements where customers of retailers agree in advance to purchase in excess of normal amounts of motor gasoline or diesel fuel and thereby receive preferential treatment.

The only instance wherein § 210.62(b) has been successfully invoked to limit a supplier's right to effect unequal price increases was in *Reeves v. Simon,* 507 F.2d 455 (Em. App.1974) where TECA upheld the application of § 210.62(b) to prohibit gasoline retailers from serving regular customers while wholly excluding others. *Id.* at 458. In *McWhirter Distributing Co. v. Texaco, Inc.,* 668 F.2d 511 (Em.App.1981), TECA discussed the issue of disparate pricing among customers, none of whom were excluded, stating that price discrimination within a class of purchaser is not *per se* illegal "as long as it is undertaken for a purpose and in a manner which does not conflict with § 210.62(b). *Id.* at 522–23 (quoting from 41 Fed.Reg. 30021–22 (July 21, 1976)).[4]

In the two cases cited above, the plaintiffs did not invoke the remedy of damages under § 210(a). Given the broad interpretation applied by TECA to the term "legal wrong", however, and that Court's willingness to consider the illegality of price discrimination under § 210.62(b) as evinced in *McWhirter* and the case at bar, we hold that an action for damages under § 210(a) may be properly founded upon a violation of § 210.62(b).[5]

claim either on the facts or the law, but remanded it for consideration by the District Court. 677 F.2d at 882. It is interesting to note that this Court's remark was interpreted as an affirmation that § 210.62(b) (prohibiting price discrimination that contravenes the objectives of the EPAA and the price regulations promulgated thereunder) does create a separate and distinct cause of action under § 210(a) of the ESA, and permits a claim for consequential damages. *United States Oil Co. v. Koch Refining Co.,* 518 F.Supp. 957, 959 (E.D.Wis. 1981). In that case, the plaintiffs were allowed to amend their complaint to include a count of price discrimination. At the time of this writing, no opinion has yet been rendered.

**4.** In *McWhirter,* TECA reversed the trial court's grant of the defendant's motion for summary judgment and remanded for further development of material issues of fact relating, among other things, to the issue of price discrimination. At the time of this writing, no opinion has yet been rendered.

**5.** In a companion case to the one now before the Court, *Eastern Air Lines, Inc. v. Atlantic Richfield Co.,* No. 74–1207–Civ–JM (S.D.Fla.

## II

## HAS EASTERN SUPPORTED AN ACTION FOR PRICE DISCRIMINATION UNDER SECTION 210(a)?

■ Under the criteria laid out in § 210.-62(b), the proper inquiry for determining whether a legal wrong under § 210(a) has occurred is whether the unequal prices charged by Mobil had the effect of "frustrating the objectives, purposes and intent" of the Act or its regulations. In *McWhirter,* the Court stated that it did not necessarily endorse the DOE's restricted view of § 210.62(b) to require a showing that pricing behavior was illegal under other applicable law, such as the antitrust statutes, or was accompanied by specific results that contravened the purpose of the EPAA. 668 F.2d at 522. Since Eastern has dropped its claim of competitive injury under the Robinson-Patman Act, and brings this action solely on the basis of § 210.62(b), it must show under the agency's test that the disparate prices charged caused specific results

1982), Judge Mishler addressed the same issue of price discrimination between non-contract customers: "Mere failure of ARCO to uniformly charge an equal increment [of increased costs] to each non-contract customer as required by the regulations does not constitute an actionable wrong for which Eastern can recover under § 210 [of the ESA]." Since Eastern had actually paid less for the same product than other non-contract customers, Judge Mishler did not reach the issue of whether such disparate pricing could constitute a "legal wrong" under § 210(a), had Eastern in fact paid more. *Id.* at 22. *See also United States Oil Co. v. Koch Refining Co.,* 518 F.Supp. 957, 959 (E.D.Wis.1981).

**6.** In 15 U.S.C. § 753(b)(1) of the EPAA, Congress directed the President to promulgate regulations that would provide for:

(A) protection of public health (including the production of pharmaceuticals), safety and welfare (including maintenance of residential heating, such as individual homes, apartments and similar occupied dwelling units), and the national defense;

(B) maintenance of all public services (including facilities and services provided by municipally, cooperatively, or investor owned utilities or by any State or local government or authority, and including transportation facilities and services which serve the public at large);

that contravened the EPAA. The only result was that Eastern paid more than TWA during the same time period for the same product. As already stated, price discrimination *per se* does not necessarily constitute a violation of the EPAA, and a more in-depth analysis is required to determine if any of the pertinent objectives of that statute or the regulations promulgated thereunder were violated by the prices Mobil charged.

## A

## THE OBJECTIVES OF THE EPAA

■ Of the nine objectives set forth in Section 753(b)(1) of the EPAA, subsections (F) and (I) bear directly upon the issue of price discrimination. Subsection (F) requires the "equitable distribution of crude oil, residual fuel oil, and refined petroleum products at equitable prices" while subsection (I) calls for a "minimization of economic distortion, inflexibility and unnecessary interference with market mechanisms."[6]

(C) maintenance of agricultural operations, including farming, ranching, dairy, and fishing activities, and services directly related thereto;

(D) preservation of an economically sound and competitive petroleum industry; including the priority needs to restore and foster competition in the producing, refining, distribution, marketing, and petrol-chemical sectors of such industry, and to preserve the competitive viability of independent refiners, small refiners, nonbranded independent marketers, and branded independent marketers;

(E) the allocation of suitable types, grades, and quality of crude oil to refineries in the United States to permit such refineries to operate at full capacity;

(F) equitable distribution of crude oil, residual fuel oil, and refined petroleum products at equitable prices among all regions and areas of the United States and sectors of the petroleum industry, including independent refiners, small refiners, nonbranded independent marketers, branded independent marketers, and among all users;

(G) allocation of residual fuel oil and refined petroleum products in such amounts and in such manner as may be necessary for the maintenance of, exploration for, and production or extraction of—

(i) fuels, and

(ii) minerals essential to the requirements of the United States,

The potential contradiction between those two mandates is largely avoided by the flexibility allowed the executive in carrying them out to the "maximum extent possible", without any requirement that one be promoted at the expense of another.[7]

Under these subsections, the relevant inquiry is whether "equitable" means "equal" in the context of prices charged two mandated, non-contract customers of the same class of purchaser, or whether a "minimization of economic distortion" allows a refiner greater flexibility in establishing the prices charged for a product.[8] In *Trans World Airlines v. Federal Energy Office*, 380 F.Supp. 560 (D.D.C.1974), *aff'd sub nom. Air Transportation Association v. Federal Energy Office*, 520 F.2d 1339 (Em.App. 1975), the Court stated:

> [T]here is nothing in the Act or the legislative history which indicates that "equitable prices" means "equal prices". . . .
> In fact, the legislative history indicates that the regulations governing the prices of petroleum products should not set specific prices for each product but rather that the regulations should only provide the manner in which prices should be determined.

*Id.* at 566. In disagreeing with the claim that the regulations allowing unequal prices violated the objectives of the statute, the Court stated:

> Nor can it be said that when the FEO was faced with seemingly inconsistent mandates, *i.e.*, to establish "equitable prices" and at the same time to minimize economic distortion and unnecessary interference with market mechanisms, it acted arbitrarily, capriciously or irrationally in placing emphasis upon the mainte-

---

7. TECA has recognized that the nine statutory objectives often conflict, *e.g.*, *Consumers Union of the United States, Inc. v. Sawhill*, 525 F.2d 1068, 1073 (Em.App.1975) (en banc), and that none is more important than any of the others. "[All] nine . . . [must] be balanced objectively."

and for required transportation related thereto;
(H) economic efficiency; and
(I) minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms.

---

nance of market mechanisms rather than construing equitable prices to mean equal prices.

*Id.* at 567.

The agency itself has rejected the claim that unequal price increases among classes of purchaser in and of itself is violative of the objectives of the EPAA. *Texaco, Inc.*, 6 DOE ¶ 83,010 at 86,097 (1980). The Department of Energy (DOE), successor agency to the FEA, said:

> The Mandatory Petroleum Price Regulations, 10 C.F.R. Part 212, do not require the maintenance of the same customary price differentials among classes of purchasers as existed during the base period. In fact, section 212.83(h) of the regulations [the equal application rule] establishes approved procedures by which firms may reflect different amounts of costs in the prices charged to different classes of purchasers.

*Id.* at 86,095.

This agency view as to the function and scope of § 210.62(b), propounded after a full adjudication of the issue, is entitled to substantial deference by the courts. *Cities Service Co. v. Federal Energy Administration*, 529 F.2d 1016, 1022–23 (Em.App.1975), *cert. denied*, 426 U.S. 947, 96 S.Ct. 3166, 49 L.Ed.2d 1184 (1976). In this action, Eastern would have the Court replace the agency's interpretation—requiring that the price differences have specific results which frustrate the EPAA's purposes—with its own view that unequal prices in and of themselves frustrate those purposes. As confirmed by the holding in *Trans World Airlines, Inc. v. Federal Energy Administration, supra*, 380 F.Supp. at 566, this view is

---

*Mobil Oil Corp. v. Department of Energy*, 610 F.2d 796, 801 (Em.App.1979), *cert. denied*, 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980). *See also Air Transport Association v. Federal Energy Office*, 520 F.2d 1339, 1342 (Em.App. 1975).

8. For the purpose of this inquiry, the Court will assume that no contract between TWA and Mobil was in effect after December 31, 1973, although this issue will be addressed later in this opinion.

untenable. Eastern has demonstrated that the price it paid to Mobil was not equal to that paid by TWA. It has failed to demonstrate, however, that the price it paid was not equitable; and its claim that price differences between members of the same class, without more, violate the objectives of the EPAA, is wholly without support.

## B

### THE OBJECTIVES OF THE PRICE REGULATIONS

Having determined that the prices Mobil charged Eastern and TWA did not contravene the general objectives of the EPAA—in that "equitable" does not mean "equal" under such circumstances—the Court now turns to the more specific objectives of the price regulations promulgated under that statute. The Mandatory Price Allocation Program, which required Mobil to supply Eastern, did not specify a sales price. Mobil was authorized to charge the maximum price permitted by Subpart E of the mandatory petroleum price regulations, 10 C.F.R. §§ 212.81–88. The only operative requirement of the price regulations stated that a refiner may "not charge to any class of purchaser a price in excess of the base price of that ... product." 10 C.F.R. § 212.-82(a). Other provisions of the price regulations dealt with the exception to this rule, allowing for increased costs to be included in arriving at the ceiling price for each class. None related to how much or how little a refiner could charge under the maximum allowable price. This is true of the specific regulations upon which Eastern relies, namely: the "single increment rule"

and the "equal application rule", with primary emphasis placed upon the latter.[9]

### 1. THE SINGLE INCREMENT RULE

The first of these regulations, the "single increment rule", characterized by Eastern as the "equal passthrough rule" 10 C.F.R. § 212.83(c)(1)(ii), requires a refiner to calculate a single increment of increased costs to be added to the May 15, 1973 transaction price for each class.[10] The increased costs for a product are to be passed through equally to each class of purchaser buying that product in determining the maximum allowable price the supplier is permitted to charge those customers, but the rule does not require that the prices actually charged under that maximum price reflect an equal passthrough of costs.

The purpose of the single increment requirement was to prohibit a refiner from passing through large "bank amounts" of increased costs to one class of purchaser by spreading those costs equally among all relevant classes in determining the maximum allowable price. Customary price differentials in the maximum lawful price for each class were thus maintained and no customer's maximum price would bear more than a proportionate share of increased costs. In Clarification 77–2, ERA Enforcement Manual (CCH) ¶ 56,102 (1977), the agency rejected Eastern's theory advanced herein that the single increment rule applies to selling prices. The agency explained that once a firm determines its "unit cost increment" to be used in setting the maximum allowable price, that cost may be unequally applied and that "a degree of price variation within a class of purchaser is not precluded by FEA regulations." *Id.* at 56,103

---

**9.** It has been stipulated by the parties, both in their memoranda and at oral argument, that the rules embodied in the price regulations apply both within and among classes of purchaser, and we are proceeding on this basis. This interpretation is further borne out in 41 Fed. Reg. 30021, 30022 (July 21, 1976), where the FEA applied the language of the "equal application rule"—that speaks in terms of "among classes of purchaser"—to price variations "within a class of purchaser". *See also* Clarification 77–2, ERA Enforcement Manual (CCH) ¶¶ 56,102, 56,103.

**10.** The single increment mechanism operates through application of the cost allocation rules set forth at 10 C.F.R. § 212.83(c)(1)(ii), which provide:

*In computing base prices* [i.e., ceiling prices] for a covered product other than a special product, a refiner may increase its May 15, 1973 selling price ... [to reflect increased product costs] ... provided that [those costs] must be equally applied to each class of purchaser. (emphasis added)

*Accord,* Interpretation 76–6, ERA Enforcement Manual (CCH) ¶ 56,292 at 56,346 (1976). As the agency itself put it:

> FEA has interpreted the "equal application" language for refiners, which is found in §§ 212.83(c)(1) and 212.-83(c)(2)(A) [the single increment provisions cited by Eastern] . . . to mean that *increased costs may be unequally applied to prices charged to classes of purchaser of the product concerned*. . .

[1974–1981 Transfer Binder] En.Mgm't (CCH) ¶ 40,289 at p. 40,548 (emphasis added)

The FEA's modifications to the single increment provision were:

> intended to make it clear that the requirement therein for equal application is nothing more than a reference to the equal application rule [explained below] —a rule which, . . . FEA interprets to permit unequal application of increased costs among classes of purchaser to the extent the firm concerned has a [sufficient] "bank" of unrecouped costs. . .

*Id.* at p. 40,553.

In short, Eastern's reliance on the single increment provision ignores its plain limitation to maximum prices. The real basis for its argument lies in the equal application rule.

## 2. THE EQUAL APPLICATION RULE

Although the single increment rule on its face allowed a refiner to pass through unequal amounts of increased costs as long as the prices charged remained below the maximum price, the pervading purpose of the price regulations was to discourage such disparate pricing. The treatment of costs left unrecovered as a result of disparate pricing was modified when the FEA, on August 30, 1974, promulgated an emergency amendment to Part 212 of its mandatory petroleum price regulations. Specifically, 10 C.F.R. §§ 212.83(d) and 212.93(e) were amended, effective September 1, 1974, to provide that if, as a result of market considerations or contracts entered into after September 1, 1974, a refiner elects to apply a lesser amount of costs to one class of purchaser than another, each class will be deemed to have been allocated the largest amount of costs actually allocated to any one class.[11] This is referred to as the "deemed recovery provision" of the equal application rule, and it results in a civil penalty applied to the refiner. Any amount not charged to one customer but charged to another may not be banked and recouped at a later date, unless the lower price was charged pursuant to a contract existing before September 1, 1974.

In other words, although refiners could apply increased costs unequally in charging prices below the ceiling, they were required to calculate their revenues as though the costs had been equally applied. The deemed recovery amendment served as a self-executing penalty to discourage disparate pricing among or within classes of purchaser by precluding a refiner from banking and recovering costs not passed through to some customers but charged to others. The amendment also provided for an exception to the deemed recovery provision in the case of lower prices charged pursuant to a contract entered into before September 1, 1974. Under this exception, a refiner was

11. The regulation, 10 C.F.R. § 212.83(h)(3)(i), originated at 39 Fed.Reg. 32306 (September 5, 1974), as part of 10 C.F.R. § 212.83(d). It became a part of 10 C.F.R. § 212.83(e)(1) in 39 Fed.Reg. 42368 (December 5, 1974); became 10 C.F.R. § 212.83(e)(3) in 40 Fed.Reg. 10444 (March 6, 1975); became 10 C.F.R. § 212.-83(e)(8) in 41 Fed.Reg. 5111 (February 4, 1976), was changed slightly while remaining 10 C.F.R. § 212.83(e)(8) in 41 Fed.Reg. 13899 (April 1, 1976); became 10 C.F.R. § 212.83(h) in 41 Fed. Reg. 15330 (April 12, 1976), was amended slightly while remaining 10 C.F.R. § 212.83(h) in 41 Fed.Reg. 18646 (May 6, 1976), and finally became 10 C.F.R. § 212.83(h)(3)(i) in 41 Fed. Reg. 30021 (July 21, 1976). The provisions regarding the exception to the equal application rule have remained essentially unchanged. In its original form, the equal application rule provided, in part, that:

> [T]he amount of increased product costs not recouped may be added to May 25, 1973 selling prices to compute base prices for covered products . . . in the subsequent month provided that the amount of the increased product cost not recouped and included . . . is equally applied to each class of purchaser.

allowed to bank its unrecovered costs to be passed through in subsequent months to other non-contract, mandated customers.

There is no doubt that the objective of the equal application rule was to structure the pricing of covered products in such a way as to promote an equal application of increased costs, either at or below the maximum allowable price. Section 212.83(d), as amended, states in its preamble that:

> [The amendments were designed] to clarify and make explicit the requirement that prices charged for each covered product must reflect the equal application of increased product costs to each class of purchaser, and that failure to charge prices that reflect equal application of increased costs, except to the extent the seller is precluded from charging such prices by the price term of a contract in effect on September 1, 1974, will result in unrecouped increased product costs which the seller will not be permitted to recover in a subsequent month.

39 Fed.Reg. 32306 (September 5, 1974).[12] *See also, Naph-Sol Refining v. Murphy Oil,* 550 F.Supp. 297 (W.D.Mich.1982); *Phillips Petroleum Co.,* 2 FEA ¶ 80,599 at 80,831 (1975). The rule is not phrased, however, in such a way as to prohibit disparate prices by casting them as "discriminatory". A review of both the relevant agency decisions and case law support this Court's interpretation that the rule discouraged, but did not prohibit, disparate prices charged to mandated, non-contract customers within the same class of purchaser. This distinc-

tion is crucial in determining whether such pricing contravenes the objectives of the price regulations in violation of § 210.62(b) as Eastern claims, or to the contrary, is viewed as an activity permissible within the regulatory framework.

That the agency viewed disparate prices as being within the scope of permissible pricing activity is clearly shown by its own interpretations and rulings. The FEA stated, in a preamble to the rule, its "interpretation that the 'equal application' rule, rather than imposing an absolute requirement of equal application [the violation of which could constitute price discrimination under § 210.62(b) and a legal wrong under § 210(a)] requires revenues to be calculated as though increased costs were so applied. This permits a degree of unequal application ...." [1974–81 Transfer Binder] En. Mgm't (CCH) ¶ 40,289 at pp. 40,548, 40,552. The agency stated that the Regulations "generally require equal application of increased product costs to the May 15, 1973 prices of each product among all classes of purchaser of that product", and that "[t]his results in a maintenance of the May 15, 1973 price differentials among classes of purchaser of each product from a refiner." 39 Fed.Reg. at 35722. The agency then noted its recent addition of the deemed recovery provision which:

> clarified ... the equal application [requirement] ... to make clear that, *to the extent that there is unequal application of ... increased product costs in prices actually charged,* the difference between the largest amount of increased product

12. The administrative enactment of the deemed recovery provision of the equal application rule has recently been held procedurally deficient and therefore invalid in *Mobil Oil Corp., et al. v. Department of Energy,* 547 F.Supp. 1246 (N.D.N.Y.1982); *Naph-Sol Refining v. Murphy Oil,* 550 F.Supp. 297 (W.D.Mich.1982); *Lakes Gas Co. v. Doe,* 477 F.Supp. 187 (D.Minn.1979). For the purposes of this decision, the Court assumes without deciding the validity of the rule. Should TECA affirm the aforementioned decisions, the disposition of this case will remain unaffected, since this Court's holding is based not only on the express enactment of the deemed recovery provision itself, but also on the underlying requirement implicit in the price regulations themselves that the difference in

the pass through of increased cost may not be recouped; a requirement "implicit in the existing regulations" that the deemed recovery provision was merely intended to "clarify and make explicit." 39 Fed.Reg. 32306 (September 5, 1974). Indeed, the retroactive application of the deemed recovery provision for the very period in question here was justified by the agency on this basis. *Standard Oil of California* ("SOCAL"), 6 FEA ¶ 80,518 (1977); *Phillips Petroleum Co.* 2 FEA ¶ 80,599 (1975). Finally, in 45 Fed.Reg. 72,629 (November 3, 1980), the DOE, in revoking the equal application rule, stated that unrecovered costs resulting from disparate pricing may still not be banked under the regulations.

cost actually applied to the price charged to any class of purchaser of a product and any lesser amount applied to the price charged to another class of purchaser may not be recouped in a subsequent month, except to the extent that a higher price could not be charged because of a pre-existing written contract.

*Id.* (emphasis added). The contention that disparate prices were violative of the equal application rule is further undermined by the agency's statement that:

[W]here, however, a seller *chooses* to charge prices for a product which reflect disparate application of increased product costs among classes of purchaser, the carryover of unrecouped increased costs will not be permitted to the extent that any class of purchaser had a lesser amount of increased costs applied to its prices than did another class of purchaser of the same product.

*Id.* 39 Fed.Reg. at 32307, 10 C.F.R. § 212.-83(d)(1) (emphasis added).

Finally, when the equal application rule was withdrawn by the DOE on November 1, 1980, the agency again confirmed that unequal pricing among class members did not violate the regulations. Rejecting the argument that elimination of the rule would leave refiners free to engage in "price discrimination" without adjusting their banks, the DOE stated: "If refiners did wish to institute discriminatory pricing, they could do so under the present regulations which allow unequal price increases provided cost recovery is computed as if the highest price increase had been charged to all customers." 45 Fed.Reg. 72,629 (November 3, 1980).

The FEA authority cited by Eastern in support of its position confirms, rather than contradicts, this Court's finding that disparate pricing was clearly contemplated by the agency as permissible activity. In *Standard Oil of California* ("SOCAL"), 6 FEA ¶ 80,518 (1977), the agency ruled that disparate prices charged for two types of jet fuel considered as a single product must

result in a penalty of the deemed recovery of the difference in the increased product costs allocated to each fuel, and that the refiner was precluded from banking the costs, even though the prices in question were charged before the deemed recovery amendment was enacted in September, 1974.[13] The agency stated "SOCAL should have applied equal amounts of product cost increase in the prices which it actually charged for the jet fuels *or* deemed as recovered the difference between the increments of increased product costs which it applied in its selling prices...." *Id.* at 80,601–80,602 (emphasis added). It was the recovery of those costs, *not* the disparate prices themselves, that were viewed as violative of the objectives of the EPAA and the price regulations promulgated thereunder. *Id.* at 80,604. The agency went on to state, "Thus the 'equal application' rule reflects the FEA's clear policy to *penalize* firms for applying their increased costs unequally ...", and accordingly SOCAL was ordered to recalculate its cost recoveries to exclude recuperation of the difference in the amounts charged. *Id.* at 80,605 (emphasis added).

Opinions by other federal courts also serve to substantiate this Court's interpretation of the equal application rule. In *Air Transport Association v. Federal Energy Office,* 382 F.Supp. 437 (D.D.C.1974), aff'd 520 F.2d 1339 (Em.App.1975), the district court summarized the operation of the equal application rule and squarely addressed the issue of equal cost passthrough, concluding that:

if, *as a result of market considerations* or contracts entered after September 1, 1974, a refiner *elects* to apply a lesser amount of costs to one class of purchaser than another, each class will be deemed to have been allocated the largest amount of costs actually allocated to any one class of purchasers for purposes of determining which costs may be carried over.

FEA ¶ 80,599 (May 30, 1975); *see* SOCAL, *supra,* at 80,603.

---

**13.** This decision followed an earlier FEA ruling on the same question, *Phillips Petroleum Co.,* 2

382 F.Supp. at 442 (emphasis added).[14] Thus, contrary to Eastern's contention, price discrepancies are not prohibited even when they exist outside the context of a preexisting contract.

Eastern's theory that the equal application rule prohibited price differences was also recently rejected in *M.A.P. Oil Co. v. Texaco, Inc.*, No. C–77–518–WAI (SJ) (N.D. Cal. Mar. 11, 1980), *rev'd on other grounds sub nom. McWhirter Distributing Co. v. Texaco, Inc.*, 668 F.2d 511 (Em.App.1981). There, gasoline wholesalers argued that Texaco "cannot lawfully increase prices unequally among classes of purchaser." *M.A.P. Oil*, slip op. at 2. The district court rejected this assertion, based largely on the agency interpretation noted above:

> The responsible agency here has interpreted the equal application rule, 10 C.F.R. § 212.83(h) (1978), in a way which defeats plaintiffs' claim. It has stated that the rule causes a seller which applies costs unequally to lose the right to recoup a part of those costs. Preamble, 41 Fed. Reg. 30,021 (1976). It made clear, however, that *"increased costs may be unequally applied to prices charged to classes of purchaser." Id. In other words, the rule deters unequal price increases. It does not forbid them.*
>
> \*     \*     \*     \*     \*     \*
>
> The preamble statement reasonably construes the equal application rule. It forecloses plaintiffs' claim that liability can be found on the mere fact that an unequal price increase alters a customary price differential. Absent a showing that a seller's price exceeds the lawful maximum, such an increase does not violate price rules.

*Id.* at 2–3 (emphasis added). Although this decision was reversed on other grounds on appeal, TECA endorsed the district court's interpretation of the price rules:

> We agree that, as the trial court held, section 212.83(h) "deters unequal price increases [but] does not forbid them," since the regulations provided a penalty for the inequality.

*McWhirter*, 668 F.2d at 520. (first brackets in original).

These holdings do not support a finding that disparate prices charged below the maximum lawful price constitute "price discrimination" *per se* under § 210.62(b) of the EPAA and a "legal wrong" under § 210(a) of the ESA. A violation of the objectives of the EPAA and the price regulations under § 210.62(b) lies not in the unequal application of increased costs, but in the subsequent recovery of the difference in the prices charged. The remedy for this violation is provided in the regulations themselves, as embodied in the self-executing penalty of the deemed recovery provision of the equal application rule, and is not to be found in an action for consequential damages.

In sum, agency rulings and court decisions establish not only that price variations within a class are permissible, but also that disparate cost passthrough between classes is lawful. Those decisions preclude Eastern's claim and establish that Mobil is entitled to judgment as a matter of law.

## III

### WERE THE LOWER PRICES CHARGED TWA PURSUANT TO A CONTRACT ENTERED INTO ON OR BEFORE SEPTEMBER 1, 1974?

■ Although the Court finds that as a matter of law, Mobil is entitled to summary judgment on the issue of disparate prices charged mandated, *non-contract* customers of the same class of purchaser, the Court separately and severally addresses the issue

---

**14.** The market considerations underlying Mobil's actions in charging TWA a lesser price than Eastern at Boston and Los Angeles were based upon TWA's agreement to pay more at Los Angeles than it would have otherwise under the original contract for that airport. Price determinations made entirely by a free market comply with the EPAA. *Consumers Union of the United States, Inc. v. Sawhill*, 525 F.2d 1068 (Em.App.1975) *quoted in Air Transport Association v. Federal Energy Office*, 382 F.Supp. 437, 450 (D.D.C.1974) *aff'd* 520 F.2d 1339 (Em.App. 1975).

of whether the prices charged TWA by Mobil during the period in question were pursuant to a contract entered into on or before September 1, 1974. The finding that a contract did indeed exist relates not to Eastern's position that this constitutes the only legal exception in which disparate prices can be charged, but rather serves as an alternate basis for granting summary judgment in Mobil's favor.[15]

The preexisting contract exception to the deemed recovery provision of the equal application rule, embodied in 10 C.F.R. § 212.-83(d), provided that if prices charged between a customer and its 1972 supplier were pursuant to a price term in a contract entered into on or before September 1, 1974, the increased costs that a refiner was unable to pass through because of the price term could be banked for subsequent recovery from mandated non-contract customers.[16] Otherwise, the deemed recovery rule prevented the banking and recuperation of the difference in the prices charged under any other circumstances, although it did not in any way limit a refiner's right to negotiate contracts or charge different prices after September 1, 1974, if they were willing to suffer the penalty of unrecouped costs.[17] Thus, the September 1, 1974 cut-off date for contracts is primarily relevant to the question whether bank adjustments had to be made if members of a class were charged different prices.

The contract involved in the principal case demonstrates that the prices paid by TWA for jet fuel during the mandatory petroleum allocation program were pursuant to the price term of a contract entered into before September 1, 1974. Mobil and TWA entered into a contract on April 4, 1966, governing the purchase of jet fuel that was to last until December 31, 1975—contingent upon mutual agreement on the price term for the last two years. The contract provided that "If a mutual agreement regarding this price cannot be reached by October 1, 1973, this [agreement] *may* be cancelled by either party effective December 31, 1973." (emphasis added). Mobil and TWA failed to reach an agreement on price before October 1, 1973, but continued their business relationship after December 31, 1973, as mandated by the allocation program. For three months TWA was charged the same "posted prices" as Eastern, computed under the price regulations. On April 1, 1974, Mobil began charging TWA less, pursuant to negotiations toward a new contract to supercede the 1966 agreement. The new contract was signed on September 4, 1974, with an effective date of April 1, 1974.

---

**15.** The question whether Mobil is required to recalculate its banks to exclude recovery of the difference in the prices charged to Eastern and TWA is not before the Court. In any event, a re-adjustment of Mobil's banks would not bear upon Eastern's recovery, since the Court has found against Eastern upon its claim herein.

**16.** 10 C.F.R. 212.83(d) states in part:
[W]here an equal amount of increased costs is not included in the price charged to a purchaser because of a price term of a written contract covering the sale of the product concerned that was *entered into* on or before September 1, 1974, that portion of the increased product costs not included in the price charged to such a purchaser need not be included in the calculation of revenues as otherwise required . . . .
*See also, Trans World Airlines, Inc. v. Federal Energy Office,* 380 F.Supp. 560 (D.D.C.1974) *aff'd sub nom Air Transport Ass'n v. Federal Energy Office,* 520 F.2d 1339 (Em.App.1975). To the extent air carriers happen to have contracts for domestic aviation fuel with the

1972 suppliers with whom they are required to deal by the FEO, which contracts provide for prices lower than the maximum prices which a refiner is permitted to charge under the FEO regulations, the FEO has not overridden such contract prices, although as noted above it has the power to preempt those contracts to effectuate its mandate.
*Id.* at 564. To prevent an abuse of this exception, the agency limited its application to contracts entered into on or before September 1, 1974. Interpretation 1976–17 ERA Enforcement Manual (CCH) ¶ 56,303 (August 26, 1976).

**17.** In Interpretation 1976–17 ERA Enforcement Manual (CCH) ¶ 56,303 (August 26, 1976), the agency held that a refiner may enter into a "new" contract after September, 1974, at prices lower than those offered other customers although it would have to adjust its banks if it did so.

Eastern claims that the 1966 contract between Mobil and TWA expired on December 31, 1973, for failure to agree upon a new price term. It is also Eastern's contention that the new contract fails to salvage TWA's status as a "preexisting contract purchaser" since it was signed after September 1, 1974, the cut-off date under the regulations.

Eastern recognizes that the prices charged TWA until December 31, 1973 were legitimate since the 1966 contract was in effect. It claims damages, however, in the sum of the amount of the difference in the prices charged between it and TWA between January 1, 1974 and October 24, 1974, at Boston, and during the months of September and October, 1974, at Los Angeles, where the contract still in effect at that location was superceded by the new agreement of September 4, 1974 (April 1, 1974).[18]

Mobil maintains that the question of when it agreed to a new price with TWA is immaterial, since neither party cancelled the contract. According to Mobil, however, the parties did verbally agree to a price between December 31, 1973 and April 1, 1974, at the same posted prices charged other customers. Negotiations for a new price resulted in a lesser charge to TWA beginning on April 1, 1974, and culminating in a new contract signed on September 4, 1974, retroactive to April 1, 1974. In August, 1974, TWA made a lump sum payment which adjusted its prices since April 1,

1974, to what was required in the new contract, but apparently still below what Eastern paid.

Both parties concur that the issue of whether the 1966 contract expired is an issue of law. The contract itself is the best evidence of its terms, and those terms make its expiration contingent upon cancellation by either party, and not automatic, in the event that they were unable to agree upon a price term by October 31, 1973. "The language of the contract, unless ambiguous, represents the intention of the parties. The intent deduced from this objective matter, not the parties' subjective understandings, is controlling." *Kimbell Foods, Inc. v. Republic National Bank of Dallas,* 557 F.2d 491, 496 (5th Cir.1977), *aff'd* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711; *see also Champion Brick Co. v. Signode Corp.,* 263 F.Supp. 387 (D.C.Md.1967).[19]

Eastern does not allege that the contract was cancelled by an affirmative act of either party, only that it "expired by its terms." The language of the contract precludes such an interpretation, and a review of the exhibits submitted indicate that neither party elected to cancel the agreement. To the contrary, the Court finds there was an ongoing effort made to negotiate a new price term, and that such a modification does not jeopardize TWA's status as a preexisting contract purchaser under the price regulations between April 1, 1974 and September 4, 1974.[20] The FEA has ruled

---

**18.** In support of this claim, it is pointed out that the 1966 contract had expired because (1) TWA was required to continue purchasing from Mobil, its 1972 supplier, in any event, (2) TWA paid the same posted prices as Eastern during January-March, 1974, and (3) if the September 4, 1974 contract superceded the 1966 contract, why was it not retroactive to January 1, 1973, instead of to April 1, 1974? The factors that Eastern cites in support of its arguments are not conclusive. There is no reason why Mobil and TWA could not have verbally agreed to operate by the posted prices other customers were charged for the three month interim period between January 1, 1974 and April 1, 1974. The fact that the new contract, signed on September 4, 1974, was retroactive to April 1, 1974, merely represents the date chosen by the parties after which a new price

was to be charged, not that the 1966 contract had expired.

**19.** Eastern cites a letter to Mobil by Raymond G. Fletcher, TWA's Vice President and General Counsel, expressing the view that the contract at Boston and Philadelphia had "expired by [its] terms ... there being no agreement on prices at either location." (Plaintiff's Memo in Support of Motion at 19.) Mobil addresses Fletcher's letter, stating that the position he took in the negotiations was not the same as his client's, as is evidenced by the new contract of September 4, 1974. (Defendant's Memo in Support of Motion at 33.) If the terms of the contract are to be taken at their face value, Mr. Fletcher's understanding is not controlling.

**20.** The new Aviation Turbine Agreement stated, in pertinent part:

that an adjustment in the price term of a contract entered into before September 1, 1974, even though occurring after that date, does not alter the status of the contract nor prevent the recoupment of banked costs. Interpretation Manual (CCH) ¶ 56,257 (April 15, 1975).

A different problem is presented with the advent of the new contract between TWA and Mobil, signed on September 4, 1974, in determining whether TWA remained a preexisting contract purchaser between that date and the end of the mandatory allocation program on October 31, 1974, at both Boston and Los Angeles. This agreement pertained not only to the renegotiation of a price term, but of the entire contract. Eastern contends that since the new contract was signed after September 1, 1974, the cut-off date for the preexisting contract exception under 10 C.F.R. § 212.83(d), Mobil's discriminatory treatment of Eastern was extended into the last two months of the allocation program. In Interpretation No. 76–17, ERA Enforcement Manual (CCH) ¶ 56,257 (April 15, 1975), the FEA stated:

> The key words are "entered into." This does not necessarily mean effective date . . . [nor] the contract's self-stated effective date. . . . Nowhere in the history of 10 C.F.R. § 212.83(h)(3)(1) [formerly § 212.83(d)] is there any indication that the exception [to the deemed recovery provision] was meant to include new contracts no matter how similar they were to previous contracts existing before September 1, 1974.

> This Agreement, made and entered into as of the first day of April, 1974 by and between MOBIL OIL CORPORATION . . . and TRANS WORLD AIRLINES, INC. . . . .
> WHEREAS, parties hereto have in force an Aviation Turbine Fuel Agreement dated April 1, 1966 containing . . . Exhibit "B" covering Los Angeles, California through December 31, 1976, Exhibit "E" covering Boston, Massachusetts through December 31, 1975 . . ., and
> WHEREAS, the parties hereto are now engaged in a dispute as to the interpretation of the above Agreements, and intend that this Agreement shall supercede said Agreements

*Id.* at 56,366. Under the FEA's interpretation of the rule, therefore, the second contract between Mobil and TWA does not qualify for the exception unless it was "entered into on or before September 1, 1974," 10 C.F.R. § 212.83(d).

■ If parties so intend, a contract is binding from the time it is made even though the parties also agree that a formal writing embodying its provisions will subsequently be prepared. *Mesa Petroleum Co. v. Coniglio,* 629 F.2d 1022 (5th Cir.1980); *Barton v. Chemical Bank,* 577 F.2d 1329 (5th Cir.1978). Although Mobil and TWA memorialized their second contract shortly after September 1, 1974, it becomes apparent from a survey of the exhibits submitted that the contract was entered into as binding in August, 1974, when a final agreement on the price term was reached and TWA made a lump-sum payment which adjusted the price it paid to the price in the new contract.[21] Thus, this agreement was not violative of either the spirit or the letter of the preexisting contract exception to the deemed recovery provision, since it cannot be said that the parties intended to "avoid the intent of the regulations to maintain price differentials between classes of purchaser" in that their agreement was "entered into" as binding before the September 1, 1974 cut-off date. Interpretation 1976–17, FEA Compliance Manual ¶ 56,303 at 56,366 (August 26, 1976).

## IV

## CONCLUSION

A full review of the agency rulings and federal court decisions pertaining to the

in their entirety from and after the date hereof.

**21.** Eastern does not deny that Mobil and TWA had reached an agreement prior to September 1, 1974, but asserts that this "is not germane to the analysis." (Plaintiff's Memo in Opposition to Cross-Motion at 15) The Court disagrees, however, and will not rewrite the regulation to require that a contract be both "written and signed before September 1, 1974." To the contrary, this Court holds that a written memorialization after the cut-off date is not a material consideration where, as here, the parties entered into the contract with an intent to be bound prior to September 1, 1974.

issue of price discrimination convinces this Court that the objectives of the EPAA and the price regulations promulgated thereunder are not violated by disparate prices charged by a refiner to mandated, non-contract customers of the same class of purchaser. The regulations themselves allow such pricing, provided that it result in the regulatory penalty of unrecouped costs. Furthermore, a review of the contracts entered into by Mobil and TWA demonstrates that Mobil is entitled to summary judgment on the additional ground that TWA qualified as a preexisting contract purchaser under the regulations.

For the foregoing reasons, it is

ORDERED AND ADJUDGED that Mobil's Cross-Motion for Summary Judgment as to Count II, paragraph 21 of the Amended Complaint on the issue of price discrimination, consequential damages, and all actions arising therefrom, is GRANTED. Eastern's Motion for Summary Judgment on the same issue is DENIED.

DONE AND ORDERED in Chambers at Miami, Florida, this 27 day of April, 1983.